CRESENCIO LEYSON, Plaintiff-Appellant, *v.* NICHOLAS
STEUERMANN, M.D., Defendant-Appellee

NO. 8746

(CIVIL NO. 6238)

APRIL 17, 1985

BURNS, C.J., HEEN AND TANAKA, JJ.

OPINION OF THE COURT BY BURNS, C.J.

Plaintiff Cresencio Leyson (Leyson) appeals the judgment in favor of defendant Nicholas Steuermann, M.D. (Steuermann), pursuant to the jury's special verdict finding Steuermann not negligent. We affirm.

The issues and our answers are as follows:

1. Having failed to object during Steuermann's opening statement and having objected only on grounds of materiality during direct examination of Steuermann, may Leyson contend on appeal that remarks in Steuermann's opening statement and certain testimony of Steuermann during examination by his counsel constitute an improper appeal to the prejudices and sympathies of the jury warranting a new trial? No.

2. Did the trial court reversibly err when it denied Leyson's motion for permission to obtain an affidavit from the jury foreman that might have revealed the name of a juror who allegedly was a dominant factor throughout jury deliberations and that the jury found Steuermann not negligent for a legally inappropriate reason? No.

3. In light of the instructions given to the jury, is the jury's special verdict manifestly against the weight of the evidence, thus requiring a new trial? No.

4. Having not objected at trial to the instructions that were given on the subject, may Leyson contend on appeal that the trial court erroneously instructed the jury on the elements of the tort that is based on the doctrine of informed consent? No.

5. Is the plain error rule applicable in this case? More specifically stated, will a miscarriage of justice occur if we affirm the trial

judge's strict enforcement of Rule 51(e), Hawaii Rules of Civil Procedure (HRCP),[1] in this case? No.

6. Did the trial court erroneously instruct the jury on the elements of the tort that is based on the doctrine of informed consent? We do not reach this question.

Leyson sought medical care from Steuermann in two separate time periods. He first began seeing Steuermann in Hilo on June 16, 1970 for a skin disorder, which was later diagnosed by Steuermann as severe psoriasis.[2]

Steuermann treated Leyson's psoriasis with injections and oral doses of corticosteroids (Kenalog, Prednisone, Bepatan, and Medrol-pak), an antimetabolite (methotrexate), and topical medication (Synalar). Steuermann generally prescribed the steroids approximately once a month in doses of either 40 or 60 milligrams. During brief periods of hospitalization, Steuermann initially treated Leyson with daily 40-milligram doses of the steroids and gradually tapered off the doses. Leyson continued as Steuermann's patient until November 1971. During this first period, Steuermann did not advise Leyson as to any possible side effects of the treatment.

After he last saw Steuermann in November 1971, Leyson moved to Honolulu where he was treated for his psoriasis by Kaiser Medical Center from approximately March 1972 until September 1972. Leyson then moved to California where he also received treatment.

In 1973, Leyson returned to Hilo. From 1974 until December 1975 Leyson was under the care of physicians at Hilo Medical Center. He received treatments of Prednisolone (similar to Prednisone) for his continuing psoriasis. In 1975, he experienced problems with his joints and required surgery to his hip.

---

[1] Rule 51(e), HRCP, provides in part: "No party may assign as error the giving or the refusal to give, or the modification of, an instruction, whether settled pursuant to subdivision (b) or subdivision (c), of this rule, unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

[2] Psoriasis is "a non-neoplastic disease of the skin characterized by abnormally rapid proliferation of epidermal cells (Van Scott et al, 1964)." *The Pharmacological Basis of Therapeutics,* Fourth Edition, The Macmillan Company (1970).

On December 8, 1975 Leyson resumed treatment by Steuermann which continued until May 1977. Steuermann treated Leyson generally with injections of the steroid Kenalog in the same doses he had administered earlier. There is conflicting evidence whether during this second period of treatment Steuermann informed Leyson of the risks created by the treatment.

From 1977 to 1979, Leyson received steroid treatment from Dr. Irwin of the Hilo Medical Group. This treatment consisted of appreciably larger doses of Prednisone (usually 60 milligrams per day, up to as much as 180 milligrams per day) and topical steroids. In 1979, Leyson was hospitalized for a severe flare up of his psoriasis at Kuakini Medical Center where he also received steroid treatment. During 1979 and 1980, Leyson began to experience pain in his shoulders and developed a cataract problem.

On March 14, 1980 Leyson brought this suit against Steuermann to recover special, general, and punitive damages based on the theories of negligence, lack of informed consent, abandonment, and breach of warranty.

In his opening statement to the jury, counsel for Steuermann stated, *inter alia,* without objection:

> His formal medical training was really interrupted by World War II and you will hear how he spent World War II, years in the concentration camp. He's one of the very fortunate survivors of that ordeal.
>
> After the war, after we tell you how the Nazis had him during the war and after the war, his camp was liberated, you might say, by the Russians. And he became a Russian prisoner and later got away from them, and after helping other people who were victims of the holocaust, he was able to come to the United States in the late '40s.

During the trial, Steuermann was examined by his counsel and testified as follows:

> A   I graduated from medical school in, uh, Romania in 1937, April of 1937.

* * * * *

> Q   Did you complete that three years of residency or extra training in dermatology in about 1941, then?
> A   About 1941, that's correct.

Q   And then what happened?

A   In 1941 I opened my own practice in town for in dermatology and, uh, syphilogical and venereal diseases which lasted until August or September of 1942 when, uh, the Nazis, like everybody else, took us away and, uh, so I was in the concentration camps 'til I was liberated by the Russians December 24, exactly Christmas day, 1944.

And they took me prisoner that time again. And, uh, I was with them for oh, believe, about six months when I walked away from them.

And, uh, escaped, rather. And then walked back to my home town to look for my family. Of course when I got home, was nobody left. From a town where there were — before the war. They were town of 120,000 people. Ten percent of them were Jews. We got back and, uh —

MR. TAKAHASHI:  Your Honor —

A — two hundred of us left.

MR. TAKAHASHI:  Your Honor, I'd like to note our objection at this time. I really don't see the materiality of this.

THE COURT:  What's the relevancy of it, Mr. Burke?

MR. BURKE:  Well, Your Honor, I'm planning on continuing right into his medical training and experience.

THE COURT:  All right. I take it that you'll get back to relevant testimony?

At the close of all the evidence, both parties moved for a directed verdict. Leyson's motion related to his claims of negligent treatment and lack of informed consent. The trial court denied both motions.

Although the jury was instructed on the theories of negligence, lack of informed consent, and breach of contract,[3] the court used plaintiff's special verdict form which asked the jury only one all inclusive question as to liability, "Was Dr. Steuermann negligent in the care or treatment of Cresencio Leyson?" Two jurors answered yes and ten answered no. The jury was not instructed on Leyson's claims of abandonment and breach of warranty.

---

[3] Thus, Leyson dropped his claims of abandonment and breach of warranty and added a claim of breach of contract.

Leyson filed a "Motion for a Judgment Notwithstanding the Verdict or in the Alternative for a New Trial." On the same day, Leyson also filed a "Motion for Order Allowing Plaintiff's Counsel to Obtain Affidavit from Jury Foreman." Attached to the motion was Leyson's counsel's affidavit which states in relevant part:

2. I have been in contact with Jean Cote, the foreman of the jury, after the verdict was rendered.

3. The case was submitted to the jury in the afternoon of January 27, 1982. As the foreman of the jury, Mr. Cote coordinated the voting process after they deliberated. According to Mr. Cote, before dinner on January 27, 1982, at least two votes were taken. On the first two ballots, the vote on the issue of negligence was nine (9) in favor of the Plaintiff and three (3) in favor of the Defendant.

4. After dinner and further consideration of the evidence, voting took place again. At least on two occasions the vote was eight (8) in favor of the Plaintiff and four (4) in favor of the defense on the issue of negligence.

5. One of the persons who spoke in behalf of the defense throughout the jury deliberations was Harold Schwartz. He was a dominant factor throughout jury deliberations.

6. Mr. Cote tells me that in his opinion one of the factors which changed the voting was Dr. Irwin's prescription of corticosteroids. It was thought that since Dr. Irwin gave more corticosteroids than the Defendant, it was unfair to find 'Dr. Steuermann negligent alone. Mr. Schwartz pointed to this and other considerations to support his position for the Defendant.

The trial court denied both of Leyson's motions. Leyson appealed.

In his opening brief, Leyson raises the following points.

1. The trial court erred in denying his motion for new trial because:

a. The above quoted remarks of Steuermann's counsel during his opening statement and testimony of Steuermann were improper appeals to the prejudices and sympathies of the jury based on race, religion, or national origin warranting a new trial.

b. The lower court erred when it denied Leyson permission to obtain an affidavit from the jury foreman.

c. The jury's verdict is manifestly against the weight of the evidence.

2. The trial court failed to properly instruct the jury with respect to the elements of the tort that is based on the doctrine of informed consent.

In response, Steuermann contends that Leyson's appeal is frivolous.

### 1.a.

Leyson appealed the denial of his motion for new trial rather than the alleged underlying error. Apparently he was concerned about his failure to properly preserve the underlying error as a point on appeal. However, he thereby increased his burden on appeal. Instead of facing the right/wrong standard applicable to prejudicial error, 11 Wright & Miller, Federal Practice and Procedure: *Civil* § 2805 (1973), he is faced with the abuse of discretion standard applicable to the denial of his motion for a new trial. *Id.* § 2803 (1973). In this case, however, the result is the same under either standard of review.

Generally, an improper appeal by an opposing party to the prejudices and sympathies of the jury is a ground for granting a motion for a new trial where 1) the moving party has been injured by the improper appeal; 2) the moving party took proper steps to preserve his right to relief; 3) the moving party sought to have the harmful effect of the improper appeal remedied by an appropriate jury instruction; and 4) the effect of the improper appeal was not adequately dissipated by the steps taken, 58 Am. Jur. 2d *New Trial* § 59 (1971); *cf. Nelson v. Hartman,* 648 P.2d 1176 (Mont. 1982); *Philpott v. Jordan,* 572 P.2d 1030, 280 Or. 803 (1977); *Bachran v. Morishige,* 52 Haw. 61, 469 P.2d 808 (1970); or 5) the error was so fundamental that gross injustice would result if a new trial is not granted. 11 Wright & Miller, Federal Practice and Procedure: *Civil* § 2805 (1973).

These requirements prevent a party "from gambling on the outcome of the jury's deliberations while secretly preserving the error to be raised on a motion for a new trial in the event of an unfavorable verdict." *Weathers v. Kaiser Foundation Hospitals,* 5 Cal. 3d 98, 103, 95 Cal. Rptr. 516, 519, 485 P.2d 1132, 1135 (1971).

With respect to the allegedly improper remarks by Steuermann's counsel during opening statement, Leyson did not object to

them prior to the verdict. With respect to Steuermann's allegedly improper testimony, Leyson's only objection prior to the verdict was made on the ground of relevancy. Moreover, Leyson did not promptly seek to have the alleged harmful effect of the allegedly improper remarks and testimony overcome by means of an instruction to the jury or a motion for a mistrial. While the remarks may have constituted an improper appeal to the sympathies of the jury, the impropriety was not so fundamental or prejudicial as to cause gross injustice if a new trial is not granted.

### 1.b.

Rule 606(b), Hawaii Rules of Evidence (1981) provides in pertinent part:

> Upon an inquiry into the validity of a verdict . . ., a juror may not testify concerning the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict . . . or concerning his mental processes in connection therewith. Nor may his affidavit or evidence of any statement by him indicating an effect of this kind be received.

Consequently, the trial court properly denied Leyson's motion for permission to obtain the jury foreman's affidavit.

### 1.c.

A motion for a new trial contending that the verdict is against the weight of the evidence is properly granted when, after an evaluation of the credibility of the evidence, the trial judge reasonably concludes that the jury's verdict was sufficiently against the weight of the evidence that the case should be retried. 9 Wright & Miller, Federal Practice and Procedure: *Civil* § 2531 (1971).

It has been said that "[b]oth the grant or denial of a motion for new trial . . . is within the trial court's discretion and will not be reversed absent a clear abuse of discretion." *Stahl v. Balsara,* 60 Haw. 144, 152, 587 P.2d 1210, 1215 (1978); *Harkins v. Ikeda,* 57 Haw. 378, 380, 557 P.2d 788, 790 (1976). However, it is questionable how much authority, if any, an appellate court has to reverse a trial judge's denial of a motion for a new trial when the ground for

the motion is that the jury's verdict is against the weight of the evidence. *See* 11 Wright & Miller, Federal Practice and Procedure: *Civil* § 2819 (1973). We need not decide the question because we conclude that the trial judge did not clearly abuse his discretion when he denied the motion.

2.

Leyson's contention that the trial court failed to properly instruct the jury requires a review of the doctrine of informed consent as applied in Hawaii. The tort based on this doctrine is more accurately described as the tort of a physician's negligent failure to disclose risk information. *See Canterbury v. Spence,* 464 F.2d 772, 791 (D.C. Cir. 1972).

The leading case in Hawaii on the doctrine of informed consent is *Nishi v. Hartwell,* 52 Haw. 188, 473 P.2d 116 (1970). It describes the doctrine as follows:

> The doctrine of informed consent imposes upon a physician a duty to disclose to his patient all relevant information concerning a proposed treatment, including the collateral hazards attendant thereto, so that the patient's consent to the treatment would be an intelligent one based on complete information. [Citations omitted.]

> However, the doctrine recognizes that the primary duty of a physician is to do what is best for his patient and that a physician may withhold disclosure of information regarding any untoward consequences of a treatment where full disclosure will be detrimental to the patient's total care and best interest. [Citations omitted.]

*Id.* 52 Haw. at 191, 473 P.2d at 119.

*Nishi,* however, alternatively described the doctrine in the following terms:

> In determining the question of physician's liability for nondisclosure courts generally follow the rule applicable to medical malpractice actions predicated on alleged negligence in treatment which requires the question of negligence to be decided by reference to relevant medical standards and imposes on the plaintiff the burden of proving the applicable standard by expert medical testimony. [Citations omitted.]

In this case, plaintiffs did not adduce any expert medical testimony to establish a medical standard from which the jury could find that defendants deviated from their duty to Dr. Nishi. The only medical standard established here justified defendants' omission to disclose.

\* \* \* \* \*

The medical standard so established was that a competent and responsible medical practitioner would not disclose information which might induce an adverse psychosomatic reaction in a patient highly apprehensive of his condition.

*Id.* 52 Haw. at 195, 196, 197, 473 P.2d at 121.

Thus, Nishi initially describes the doctrine as a precise and definite duty but then it alternatively describes the doctrine as a duty to comply with relevant medical standards. These two descriptions appear to be contradictory. Moreover, the latter approach fails to recognize that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his [or her] own body," *Schloendorff v. Society of New York Hospital,* 211 N.Y. 125, 129, 105 N.E. 92, 93 (1914), and that what the medical profession thinks their patients should be told is not necessarily what their patients would find significant in making their informed choices. *See, e.g., Canterbury v. Spence,* 464 F.2d 772 (D.C. Cir. 1972); *Scott v. Bradford,* 606 P.2d 554 (Okla. 1979).

Although the question of what must be disclosed is not clear, there is general agreement as to what does not have to be disclosed.

The informed consent doctrine is circumscribed by a variety of limitations, and the physician is not required to disclose risks that are unexpected[4] or immaterial, by whatever standard, nor even material risks where disclosure is precluded by an emergency situation, by the patient's incapacity,[5] by the patient's waiver of his right to receive the information, or where

---

[4] We question the use of the word "unexpected." The mere fact that the reasonable and competent physician does not expect the occurrence of an improbable risk should not negate his duty of disclosure. We think "unforeseen" is a better word.

[5] If the patient is incapacitated in a nonemergency situation, disclosure must be given to and consent must be obtained from the legal guardian of the person of the incapacitated patient. *See* Hawaii Revised Statutes §§ 560:5-312(a)(3) (1976) and 671-3(a) (Supp. 1984).

disclosure would be harmful to the patient, which gives the doctor a "therapeutic privilege" to withhold the information. Nor, of course, need the doctor disclose risks that are commonly understood, obvious, or already known to the patient.

Prosser and Keeton on *The Law of Torts*, § 32 at 192 (5th ed. 1984) (footnotes omitted) (footnotes added.)

Although these limitations are not defenses and are a part of the definition of the duty, the defendant-physician has the initial burden of going forward with evidence pertaining to them. If and when the physician meets that burden, however, the plaintiff-patient has the ultimate burden of proving their nonexistence. *Canterbury v. Spence, supra*, 464 F.2d at 791.

On June 9, 1976 Hawaii Revised Statutes (HRS) chapter 671, which deals with medical torts, became effective.[6] Prior to its amendment in 1983[7], it stated in relevant part as follows:

[§ 671-1] Definitions. As used in this chapter:
(1) "Health care provider" means a physician or surgeon licensed under the laws of the State[.]

---

[6] Act 219, § 2, 1976 Haw. Sess. Laws 523-33.

[7] On June 8, 1983, §§ 671-1(1) was amended by Act 223, § 1, 1983 Haw. Sess. Laws 468, 469, in relevant part as follows:

"Health care provider" means a physician or surgeon licensed under chapter 453 [Medicine and Surgery], a physician or a physician and surgeon licensed under chapter 460 [Osteopathy], . . . and employees of any of them.

On June 14, 1983, §§ 671-3(a) and (b) were amended by Act 284, § 1, 1983 Haw. Sess. Laws 604-06, as follows:

Informed consent; board of medical examiners standards.

(a) The board of medical examiners, insofar as practicable, shall establish standards for health care providers to follow in giving information to a patient, or to a patient's guardian if the patient is not competent to give an informed consent, to insure that the patient's consent to treatment is an informed consent. The standards may include the substantive content of the information to be given, the manner in which the information is to be given by the health care provider and the manner in which consent is to be given by the patient or the patient's guardian.

(b) If the standards established by the board of medical examiners include provisions which are designed to reasonably inform a patient, or a patient's guardian, of:

(1) The condition being treated;
(2) The nature and character of the proposed treatment or surgical procedure;
(3) The anticipated results;
(4) The recognized possible alternative forms of treatment; and

(2) "Medical tort" means professional negligence, the rendering of professional service without informed consent, or an error or omission in professional practice, by a health care provider, which proximately causes death, injury, or other damage to a patient.

\* \* \* \* \*

[§ 671-3] Informed consent; board of medical examiners standards. (a) In any action for medical tort based on an incident that occurred after January 1, 1977, based on the render-

---

(5) The recognized serious possible risks, complications, and anticipated benefits involved in the treatment or surgical procedure, and in the recognized possible alternative forms of treatment, including nontreatment.

then the standards shall be admissible as evidence of the standard of care required of the health care providers.

We note that HRS § 671-3(b) (Supp. 1984) applies a duty to disclose the "recognized serious possible risks, complications, and anticipated benefits involved."

The Board of Medical Examiners consists of seven licensed physicians or surgeons and two lay members appointed by the Governor and confirmed by the Senate. HRS § 453-5 (Supp. 1984).

In Stand. Comm. Rep. 823 on S.B. 236, the Health and Judiciary Committees of the 1983 Legislature commented on the bill which resulted in the June 14, 1983 amendment of §§ 671-3(a) and (b). In relevant part the report states:

In their hearings on this measure, your Committees addressed the question of a general directive for informed consent versus the identification of specific procedures. Your Committees were told by the Board of Medical Examiners that the range of procedures subject to consent, numbering in the thousands, was so large that the Board found it impossible to develop standards for each procedure.

Your Committees agree that this task may be too large for the Board, but remain convinced that there are some procedures which are so controversial, which have such a grave result for the patient or which are the subject of new medical findings as to efficacy that they should receive special attention from the Board of Medical Examiners. Your Committees believe that the number of such procedures is much smaller, and that it can be reasonably addressed by the Board.

Accordingly, your Committees have amended S.B. No. 236, S.D. 1 to require the Board to develop standards for informed consent, insofar as practicable, commencing with mastectomies. It is your Committees' intent that the Board should proceed as expeditiously as possible to address controversial procedures, and that the Board report its progress to the 1984 Regular Session of the Legislature, together with its plans for the further development of standards for informed consent. Your Committees recognize that to comply with this direction the Board may have to defer the development of standards for procedures that are routine, noncontroversial or so well established that there is no question of their employment.

1983 House Journal at 1219-1220.

ing of professional service without informed consent, evidence may be introduced that the health care provider complied with standards established by the board of medical examiners governing the information required to be given by or at the direction of the health care provider to a patient, or the patient's guardian in the case of a patient who is not competent to give informed consent.

(b) The board of medical examiners shall, insofar as practicable, establish reasonable standards of medical practice, applicable to specific treatment and surgical procedures, for the substantive content of the information required to be given and the manner in which it is given and in which consent is received in order to constitute informed consent from a patient or a patient's guardian. The standards shall include provisions which are designed to reasonably inform and to be understandable by a patient or a patient's guardian of the probable risks and effects of the proposed treatment or surgical procedure, and of the probable risks of not receiving the proposed treatment or surgical procedure. The standards established by the board shall be prima facie evidence of the standards of care required but may be rebutted by either party.

(c) Nothing in this section shall require informed consent from a patient or a patient's guardian when emergency treatment or emergency surgical procedure is rendered by a health care provider and the obtaining of consent is not reasonably feasible under the circumstances without adversely affecting the condition of the patient's health.

We note that HRS § 671-3 (1976) does not apply *Nishi's* duty to disclose "all collateral hazards." Rather, it applies a duty to disclose "the probable risks and effects of the proposed treatment or surgical procedure." It is not clear from the language or history of chapter 671 whether the legislature's intent was to supplant *Nishi's* ambiguously defined duty of disclosure.

Nevertheless, the tort of Steuermann's negligent failure to disclose risk information involves the following material elements: (1) Steuermann owed a duty to disclose to Leyson the risk of one or more of the collateral injuries that Leyson suffered; (2) Steuer-

mann breached his duty; (3) Leyson suffered injury;[8] and (4) Steuermann's breach of duty was a cause[9] of Leyson's injury in that: (a) Steuermann's treatment was a substantial factor in bringing about Leyson's injury and (b) Leyson, acting rationally and reasonably, would not have undergone the treatment had he been informed of the risk of the harm that in fact occurred;[10] and (5) no other cause is a superseding cause.[11]

Leyson contends that the lower court failed to properly instruct the jury as to the alleged tort because the court refused to give Plaintiff's Requested Instruction Nos. 12 through 19. Thus, the questions he attempts to raise are (a) whether those instructions are relevant under the evidence; (b) whether they correctly state the law; and (c) whether the points covered by them were adequately and fully covered by other instructions given by the court. *Sherry v. Asing*, 56 Haw. 135, 144, 531 P.2d 648, 655 (1975).

In relevant part the lower court instructed the jury as follows:

What a doctor should tell his patient before starting treatment must be established by the testimony of doctors. [Defen-

---

[8] Query. What is the proper measure of damages? *See* Waltz & Scheuneman, *Informed Consent to Therapy*, 64 N.W.U.L. Rev. 628, 648-649 (1969).

[9] *See McKenna v. Volkswagenwerk*, 57 Haw. 460, 558 P.2d 1018 (1977).

[10] There is disagreement whether this question should be examined from the viewpoint of Leyson, a reasonable person in Leyson's position, an ordinary person in Leyson's position, or some other viewpoint. *Scott v. Bradford*, 606 P.2d 554 ((Okla. 1979); *Canterbury v. Spence*, 464 F.2d 772, 790-91 (D.C. Cir. 1972); Prosser and Keeton, *supra*, § 32 at 191-92. We agree that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his [or her] own body." *Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 129, 105 N.E. 92, 93 (1914). Moreover, we recognize that what a reasonable and competent physician thinks his patient should be told is not necessarily what the patient would find significant in making his decision. Since it never happened, however, it is impossible to determine what Leyson would have done had he been properly informed. Moreover, the reasonableness factor would weigh heavily, if not predominantly, in the determination of the credibility and weight of the evidence on the subject. Consequently, we opt for the application of a modified objective standard that determines the question from the viewpoint of the actual patient acting rationally and reasonably.

[11] The superseding cause rule involves the factual question whether the alleged superseding cause was reasonably foreseeable. *McKenna v. Volkswagenwerk, supra.* Although plaintiff has the burden of proving that an alleged superseding cause is not a superseding cause, we think plaintiff's burden arises only when defendant produces sufficient evidence to raise the issue.

dant's Requested Instruction 3, given as modified by agreement.]

If you find from the evidence that a [sic] defendant failed in his duty to reasonably inform the patient as to the potential risk and as to the possible alternative modes of treatment, you should find him to be liable for negligence in this respect. [Plaintiff's Requested Instruction 20, given by agreement.]

And even if you are satisfied that a treatment of the patient conformed in every way to the standards required of one in his situation, if you find that his failure to disclose resulted in the injury complained of, you should find the defendant liable in damages. [Plaintiff's Requested Instruction 20, given by agreement.]

Before you may find a practitioner liable for failure to disclose to his patient the potential risks and hazards of the proposed treatment, you must find that the patient has suffered injury and that the injury was the result of the failure adequately to inform the patient in this matter. [Plaintiff's Requested Instruction 21, given by agreement.]

Plaintiff's Requested Instructions Nos. 13, 14, and 15 (Instructions P-13, P-14, and P-15) read as follows:

### PLAINTIFFS' REQUESTED INSTRUCTION NO. 13

The doctrine of informed consent requires first, that the physician know of all adverse side effects inherent in a proposed course of treatment that a reasonably careful and skillful physician in good standing would know about. The failure to know of such side effects is negligence.

### PLAINTIFFS' REQUESTED INSTRUCTION NO. 14

Second, the physician has a duty to disclose to his patient all relevant information which the patient needs to make an informed choice as to whether he will accept or forego the proposed treatment. The physician must inform the patient, in lay terms, of all material risks of the treatment, the recognized alternative forms of treatment, the risks, if any, of the alternative forms of treatment, and the risks, if any, of no treatment at

all. The failure of the physician to inform his patient as I have just instructed you may be negligence.

### PLAINTIFFS' REQUESTED INSTRUCTION NO. 15

The amount of information that must be disclosed is that which the physician knows or should know would be regarded by a reasonable person in the patient's position when deciding whether to accept or forego the proposed course of treatment. In other words, the patient is entitled to all relevant information necessary for him to make an informed choice. Further, if the physician knows or should know of a patient's unique concerns or lack of familiarity with medical problems, this may require even greater disclosure by the doctor.

The relevant difference between the court's and Leyson's instructions is the difference between Defendant's Requested Instruction 3, given as modified by agreement (Instruction D-3 Modified), and Instructions P-14 and P-15. Under Instruction D-3 Modified, doctors decide what a doctor should have told his patient before starting treatment. Under Instructions P-14 and P-15, the doctor must disclose all information that a reasonable person in Leyson's position would have found relevant. In this case, however, we need not decide whose instructions, if either, correctly states the law because Instruction D-3 Modified was given with the agreement of Leyson's counsel subject only to his understanding that it would be followed immediately by Plaintiff's Requested Instruction 20. That understanding was in fact fulfilled.

Rule 51(e), HRCP, provides that no party may assign as error the giving of an instruction unless he objects thereto before the jury retires to consider its verdict. Under that rule, Leyson is barred from raising the issue on appeal. Nevertheless, the trial judge has some discretion to depart from a strict enforcement of Rule 51(e), HRCP, when such action is necessary to prevent a miscarriage of justice. *Struzik v. City and County of Honolulu,* 50 Haw. 241, 437 P.2d 880 (1968). Appellate courts have similar discretion under the plain error rule. 9 Wright & Miller, Federal Practice and Procedure: *Civil* § 2558 (1971). Thus, the question is whether a miscarriage of justice will occur if we do not bend Rule 51(e), HRCP. Our answer is no.

Leyson's counsel agreed to Instruction D-3 Modified not-withstanding the trial court's refusal to give Instructions P-13, P-14, and P-15. Upon a review of the record, we conclude that Leyson's counsel was not certain that Instruction D-3 Modified was wrong and was so convinced that he would win even if Instruction D-3 Modified was given that he decided not to object to it. Under those circumstances, we cannot conclude that a miscarriage of justice would result if Rule 51(e), HRCP, is strictly enforced in this case. Just as Rule 60(b)(6), HRCP, "is not for the purpose of relieving a party from free, calculated, and deliberate choices he has made[,]" 11 Wright & Miller, Federal Practice and Procedure: *Civil* § 2864 at 214 (1973), the plain error rule is likewise not for such purpose.

3.

We do not find the appeal to be frivolous.
Affirmed.
*Paul Tsukiyama* (*Herbert R. Takahashi* and *Linda K. Goto* on the briefs; *Herbert R. Takahashi* of counsel) for plaintiff-appellant.

*Barry M. Kurren* (*Edmund Burke* with him on the brief; *Burke, Ashford, Sakai, McPheeters, Bordner & Gilardy* of counsel) for defendant-appellee.