903 P.2d 667

Noah Phillip BERNARD, III, Plaintiff–
Appellee–Respondent,

v.

John K. CHAR, D.D.S., Defendant–
Appellant–Petitioner,

and

John Does 1–10, Jane Does 1–10, Doe Part-
nerships 1–10, Doe Corporations 1–10,
Doe Non–Profit Corporations 1–10, Doe
Governmental Entities 1–10, Defendants.

No. 15634.

Supreme Court of Hawai'i.

Oct. 6, 1995.

Peter C.–P. Char and Anne S. Kwiatkow-
ski of Char, Hamilton, Campbell & Thom, on

the briefs, Honolulu, for defendant-appellant-petitioner John K. Char, D.D.S.

William L. Goo, Roy Y. Yempuku, Gordon I. Ito of Yempuku & Goo, on the briefs, Honolulu, for plaintiff-appellee-respondent Noah Phillip Bernard, III.

Before MOON, C.J., LEVINSON, NAKAYAMA and RAMIL, JJ., and CRANDALL, Circuit Judge, in place of KLEIN, J., Recused.

MOON, Chief Justice.

In this dental malpractice case involving, *inter alia*, a claim for relief founded on the common law doctrine of informed consent, defendant-appellant-petitioner John K. Char, D.D.S. (Dr. Char) appeals from the judgment, amended judgment, and two orders of the First Circuit Court in favor of plaintiff-appellee-respondent Noah Phillip Bernard, III. By opinion filed May 19, 1995, the Intermediate Court of Appeals (ICA) affirmed the judgments and orders. *See Bernard v. Char,* 79 Hawaiʻi 371, 903 P.2d 676 (Haw.App.1995).

We granted certiorari to clarify two aspects of Hawaiʻi's common law doctrine of informed consent as characterized in · the ICA's decision in the present case: (1) whether the standard of a physician's disclosure of risk information to a patient prior to treatment is assessed from the patient's, and not the physician's, point of view; and (2) whether, to establish causation, a plaintiff-patient must testify that the plaintiff-patient actually would not have undergone the medical treatment or procedure that allegedly caused the plaintiff-patient's injury had the plaintiff-patient been properly informed by the defendant-physician of the risk of the injury that came to fruition.

We affirm the judgments and orders of the First Circuit Court and the result reached by the ICA in its decision; we do so, however, for different reasons, as set forth below.

## I. *BACKGROUND*

The facts forming the basis of the dispute in the present case are exhaustively set forth in the ICA's decision. *See Bernard,* 79 Ha-waiʻi at 373–376, 903 P.2d at 678–81. We therefore briefly recount only the facts pertinent to this decision.

On January 10, 1987, Bernard went to Dr. Char's office, complaining of a toothache. An x-ray revealed that Bernard's second molar on the upper left side of his mouth (tooth no. 15) was extensively decayed. Dr. Char also noted that Bernard's adjoining wisdom tooth (tooth no. 16) was unusually small and crooked and that the gum surrounding tooth no. 15 was red and inflamed. Dr. Char further noted that the bone containing teeth nos. 15 and 16 seemed to be thin, and Dr. Char suspected that tooth no. 15 might be "ankylosed," or fused, to the bone.

There was conflicting testimony at trial as to what transpired after Dr. Char examined Bernard. Dr. Char testified that he recommended that a root canal procedure be performed in order to save the decayed tooth no. 15 and that he explained the risks and benefits of a root canal procedure. According to Dr. Char, when Bernard stated that he could not afford to undergo a root canal procedure, Dr. Char discussed with Bernard the alternative of tooth extraction, again explaining the risks and benefits of the procedure. Dr. Char claimed that he specifically advised Bernard that extraction was a "last resort." He also informed Bernard that: (1) Bernard's buccal plate (a bone near his cheek) was thin; (2) Bernard could suffer bone loss; and (3) Bernard might require an additional extraction of tooth no. 16 if tooth no. 15 were removed.

Bernard, on the other hand, testified that Dr. Char advised him that extraction was the best alternative because tooth no. 15 was badly decayed. Bernard claimed that Dr. Char did not inform him of the possible adverse consequences that could result from the extraction procedure. Dr. Char's two dental assistants corroborated Bernard's testimony in that neither heard Dr. Char inform Bernard of any possible problems or complications that could result from undergoing the extraction procedure. Because Bernard financially could not afford the root canal pro-

cedure, he opted for the relatively less expensive extraction procedure.[1]

Dr. Char's suspicion regarding the fused teeth was apparently well-founded. While extracting tooth no. 15, Dr. Char felt "something crack," and, in addition to tooth no. 15 being extracted, Dr. Char removed tooth no. 16, as well as portions of Bernard's buccal plate and antrum bone, all of which were fused together. The extraction left Bernard with a dime-sized hole leading from his mouth to his sinus cavity, causing blood from his mouth to flow out through his nose.

After several bleeding episodes and follow-up visits, Bernard filed a six-count complaint against Dr. Char alleging: (1) negligent performance of dental procedures; (2) lack of informed consent; (3) breach of fiduciary duty and warranties; (4) negligent rendering of follow-up care; (5) negligent and/or fraudulent and/or unethical prescription of herbal compounds and unfair and deceptive trade practices; and (6) punitive damages. At the close of his case-in-chief at trial, Bernard voluntarily withdrew counts 3 and 5, and the trial court granted Dr. Char's motion for a directed verdict as to count 6. The jury returned a special verdict in favor of Bernard, finding that Dr. Char was negligent and that his negligence was the legal cause of Bernard's injury. In addition, the jury concluded that Bernard was contributorily negligent, but that his negligence was not the legal cause of his injuries. The jury awarded Bernard $56,000.00 in general damages and $400.00 in special damages. Judgment was entered on June 26, 1991.

Thereafter, Dr. Char filed a motion for remittitur, or, in the alternative, for new trial. The trial court granted the motion for remittitur but denied the motion for new trial in an order filed on September 17, 1991;[2] an amended judgment, pursuant to that order, was entered on February 25, 1992, in the total amount of $37,788.30, reflecting $35,400.00 in remitted damages and $2,388.30 in costs awarded in favor of Bernard.

Dr. Char timely appealed, challenging the judgment and amended judgment in favor of Bernard, as well as the orders pertaining to Dr. Char's motion for remittitur, or, in the alternative, for new trial. As previously indicated, the ICA affirmed the trial court's judgments and orders.

On appeal, the ICA held that Bernard sufficiently established both: (1) the standard for the physician's duty to disclose risks of harm prior to treatment; and (2) causation, so as to withstand Dr. Char's motion for a directed verdict. In so holding, the ICA applied the "patient-oriented" standard of disclosure, which does not require presentation of expert medical testimony, thus essentially rendering moot Dr. Char's contention that Bernard failed to meet his burden of presenting expert medical testimony.

As to causation, the ICA applied the "modified objective standard" for causation first announced by the ICA in *Leyson v. Steuermann*, 5 Haw.App. 504, 705 P.2d 37 (1985). Under the modified objective standard, causation is determined "from the viewpoint of the actual patient acting rationally and reasonably." *Bernard*, 79 Hawai'i at 384, 903 P.2d at 689. The ICA therefore concluded that, because the record showed that Bernard was in excruciating pain, was unemployed, and had no dental insurance, there was sufficient evidence under the modified objective test for a jury to find that, had he been advised of the risks of tooth extraction, Bernard, acting rationally and reasonably, would have chosen to undergo the more expensive but less risky root canal procedure that Dr. Char had recommended.

Dr. Char subsequently filed an application for a writ of certiorari, which this court granted by order dated May 30, 1995.

## II. *DISCUSSION*

### A. *The Patient–Oriented Standard of Disclosure*

Dr. Char first argues that the ICA's opinion in the present case, which adopts the

---

1. Although the difference in cost between the root canal and the extraction procedure was never precisely quantified at trial, both parties agree that the difference was approximately $200.00.

2. The September 17, 1991 order was subsequently amended on September 20, 1991, apparently to correct the amount of $35,000.00 to $35,400.00.

patient-oriented standard of disclosure in actions based on the doctrine of informed consent, should be reversed as being in apparent conflict with this court's decisions in *Nishi v. Hartwell,* 52 Haw. 188, 52 Haw. 296, 473 P.2d 116 (1970), and *Craft v. Peebles,* 78 Hawai'i 287, 893 P.2d 138 (1995). This issue, however, has been resolved by our recent adoption of the patient-oriented standard of disclosure in *Carr v. Strode,* No. 16079, 79 Hawai'i 475, 904 P.2d 489 (1995). In *Carr,* we approved of the reasoning utilized by the ICA in *Bernard* and overruled *Nishi* and distinguished *Craft* to the extent they conflicted with *Carr. Id.,* slip op. at 21–23, 79 Hawai'i at 485–86, 904 P.2d at 499–500. We therefore need not address Dr. Char's first argument.

### B. The "Modified Objective Standard" of Causation

#### 1. Dr. Char Misreads *Leyson* and Misinterprets the "Modified Objective Standard"

█ In *Leyson,* the ICA set out the elements of the tort of a physician's failure to disclose risks of harm prior to treatment as follows:

(1) [the physician] owed a duty to disclose to [the patient] the risk of one or more of the collateral injuries that [the patient] suffered; (2) [the physician] breached [his or her] duty; (3) [the patient] suffered injury; and (4) *[the physician's] breach of duty was a cause of [the patient's] injury in that:* (a) [the physician's] treatment was a substantial factor in bringing about [the patient's] injury and *(b) [the patient], acting rationally and reasonably, would not have undergone the treatment had he [or she] been informed of the risk of the harm that in fact occurred;* and (5) no other cause is a superseding cause.

5 Haw.App. at 516–17, 705 P.2d at 47 (emphases added).

Discussing element 4(b) [hereinafter, part (b) causation], the *Leyson* court noted that:

There is disagreement whether this question should be examined from the viewpoint of Leyson, a reasonable person in Leyson's position, an ordinary person in Leyson's position, or some other viewpoint.

We agree that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his [or her] own body." *Schloendorff v. Society of New York Hospital,* 211 N.Y. 125, 129, 105 N.E. 92, 93 (1914). Moreover, we recognize that what a reasonable and competent physician thinks his patient should be told is not necessarily what the patient would find significant in making his [or her] decision. *Since it never happened, however, it is impossible to determine what Leyson would have done had he been properly informed.* Moreover, the reasonableness factor would weigh heavily, if not predominantly, in the determination of the credibility and weight of the evidence on the subject. Consequently, we opt for the application of a modified objective standard that determines the question from the viewpoint of the actual patient acting rationally and reasonably.

*Id.* at 517 n. 10, 705 P.2d at 47 n. 10 (some citations omitted and emphasis added).

Referencing the highlighted language above, Dr. Char maintains that Bernard failed to establish part (b) causation. Dr. Char argues that it was not "impossible to determine" what Bernard "would have done had he been properly informed" because Bernard was available to testify about what he subjectively would have done. By not testifying as to what he would have done, Dr. Char argues that Bernard failed to carry his burden, and "the jury is forced to substitute their judgment for the judgment of the patient." We disagree with Dr. Char's reading of *Leyson.*

█ We believe it is clear from the above-quoted passage from *Leyson* that the "impossibility" surrounding the task of determining what the patient would have done had he or she been properly informed stems not from the patient's reluctance or inability to testify, or from the patient's counsel's failure to elicit testimony from the patient regarding what the patient subjectively would have done had the patient been properly informed; rather, the "impossibility" stems from the fact that the proper disclosure was not made. The passage from *Leyson,* therefore, merely com-

ments on one of the lamentable, yet inescapable, characteristics of the inquiry surrounding resolution of the causation issue in a case involving a claim for relief founded on the doctrine of informed consent, that is, that the part (b) causation inquiry rests on pure conjecture. The passage does not implicitly set out a requirement that, in order to sufficiently establish causation in an informed consent case, the plaintiff-patient must actually testify as to what the plaintiff-patient subjectively would have done had the proper disclosure been made.

Moreover, we believe it would be unusual for a plaintiff not to claim that, had he or she had been properly informed, he or she would have declined treatment. As one commentator has noted:

> In virtually every such case, plaintiff-patient will testify that, given adequate disclosure, he [or she] would not have consented, and the plaintiff's right to recover and the defendant physician's vulnerability to liability should not be made dependent on that self-serving testimony of the plaintiff. How persuasive is that explanation?

> It should be conceded immediately that indeed plaintiff will testify that, adequately informed, he [or she] would not have consented. To do otherwise, would require the granting of defendant's motion for nonsuit or directed verdict and would make one wonder why plaintiff and his lawyer had invested all of the time, effort and money necessary for the preparation for and the participation in the trial.

Seidelson, *Medical Malpractice: Informed Consent Cases in "Full–Disclosure" Jurisdictions*, 14 Duquesne L.Rev. 309, 330 (1976) [hereinafter Seidelson]; *see also Cobbs v. Grant*, 8 Cal.3d 229, 245, 104 Cal.Rptr. 505, 515–16, 502 P.2d 1, 11 (1972) ("Since at the time of trial the uncommunicated hazard has materialized, it would be surprising if the patient-plaintiff did not claim that had he [or she] been informed of the dangers he [or she] would have declined treatment. Subjectively, he [or she] may believe so, with the 20/20 vision of hindsight, but we doubt that justice will be served by placing the physician in jeopardy of the patient's bitterness and disillusionment.").

### 2. Objective, Subjective, or Modified Objective Standard?

A question remains, however, as to whether the ICA's "modified objective standard" is the proper standard for determining part (b) causation in informed consent cases generally. Three standards for determining part (b) causation have evolved in the informed consent jurisprudence: (1) the "objective standard," best represented by the United States Court of Appeals for the District of Columbia's seminal decision in *Canterbury v. Spence*, 464 F.2d 772 (D.C.Cir.), *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972); (2) the "subjective standard," best represented by the Oklahoma Supreme Court's decision in *Scott v. Bradford*, 606 P.2d 554 (Okla.1979); and (3) the "modified objective standard" crafted by the ICA in *Leyson*.

The *Canterbury* court held that the causation issue is better resolved on an objective basis "in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance." 464 F.2d at 791. The court went on to note:

> If adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm, causation is shown, but otherwise not. The patient's testimony is relevant on that score of course, but it would not threaten to dominate the findings. And since that testimony would probably be appraised congruently with the factfinder's belief in its reasonableness, the case for a wholly objective standard for passing on causation is strengthened. Such a standard would in any event ease the fact-finding process and better assure the truth as its product.

*Id.*

Proponents of the subjective standard essentially opt to rest the causation issue on the factfinder's assessment of the credibility of the patient's testimony that the patient would not have consented to the medical procedure that led to his or her injury. Seidelson notes:

Surely the jury will recognize the apparent self-interest underlying that testimony of the plaintiff. And, just as surely, counsel for the defendant, in summation, will underscore that self-interest as a critical factor to be considered by the jury in determining the credibility to be extended the plaintiff and the weight to be given his [or her] testimony. In all likelihood, that portion of defendant's summation will be contemplated by an instruction from the court to the jury to take self-interest into account in determining matters of credibility and weight. Moreover, the jury is likely to realize that, self-interest aside, the plaintiff may find it difficult to know factually whether or not he [or she] would have consented, given an adequate disclosure, before suffering the ultimate adverse consequences. That, too, seems calculated to affect the jury's determination of whether or not to credit plaintiff's testimony that he [or she] would have withheld consent. And, finally, it should be emphasized that, even assuming the use of an objective standard, the jury's acceptance of plaintiff's testimony that he [or she] would not have consented is a prerequisite to a verdict for the plaintiff. It is difficult to understand why that jury determination would become less reliable if the subjective standard were employed.

*Seidelson, supra,* at 330–31.

Critics of the objective standard contend that judging causation objectively is inconsistent with the motive force behind application of the patient standard, that is, preserving the patient's right of self-determination. The *Scott* court noted:

Although the *Canterbury* rule is probably that of the majority, its "reasonable man" approach has been criticized by some commentators as backtracking on its own theory of self-determination. The *Canterbury* view certainly severely limits the protection granted an injured patient. To the extent the plaintiff, given an adequate disclosure, would have declined the proposed treatment, and a reasonable person in similar circumstances would have consented, a

patient's right of self-determination is *irrevocably lost.* This basic right to know and decide is the reason for the full-disclosure rule. Accordingly, we decline to jeopardize this right by the imposition of the "reasonable man" standard.

606 P.2d at 559 (emphasis in original).

Considering the subjective standard, however, the *Canterbury* court noted:

[The subjective] method of dealing with the issue of causation comes in second-best. It places the physician in jeopardy of the patient's hindsight and bitterness. It places the factfinder in the position of deciding whether a speculative answer to a hypothetical question is to be credited. It calls for a subjective determination solely on testimony of a patient-witness shadowed by the occurrence of the undisclosed risk.

464 F.2d at 790–91.

In an attempt to address problems associated with the objective and subjective standards and to cull the favorable aspects of each, the ICA in *Leyson* sought to tread the middle ground in fashioning its "modified objective standard." Ideally, determining the question of part (b) causation "from the viewpoint of the actual patient acting rationally and reasonably" in accordance with the modified objective standard presumably respects the patient's right of self determination and, at the same time, protects the physician from any possible bitterness or hindsight on the part of the patient.

Yet aspiration toward such goals is not without its concomitant costs. Even if the modified objective standard could be said to successfully achieve such effects, we perceive two significant problems associated with the standard. First, in the ten years since its inception, the modified objective standard has not been adopted in other jurisdictions. Research to date indicates that the ICA appears to be the only court in the nation that utilizes the modified objective standard. One other court, the Supreme Court of Minnesota, utilizes what it terms a "modified objective standard" for the standard of disclosure,[3]

---

**3.** *Cornfeldt v. Tongen,* 262 N.W.2d 684, 702 (Minn.1977) ("The best accommodation of pro-

fessional competence and patient self-determination appears to be utilization of both the medical

but applies a purely objective standard to the causation question.[4]

Second, and more importantly, the modified objective standard is difficult to apply. In its effort to achieve the desired result of combining the objective and subjective standards, the modified objective standard injects at least one extra level of complexity into the causation analysis. Under the objective standard, the factfinder must suspend his or her own viewpoint and step into the viewpoint of a reasonable person to objectively assess the plaintiff-patient's decision to undergo the treatment. Under the subjective standard, the factfinder must simply assess the credibility of the plaintiff-patient when he or she invariably asserts that he or she would have declined treatment with proper disclosure. Under the "modified objective standard," however, the factfinder must first suspend his or her viewpoint, then place himself or herself in the mind of the actual patient, and, then, while maintaining the viewpoint of the actual patient, try to determine what the actual patient would have decided about the proposed medical treatment or procedure, if the actual patient were acting rationally and reasonably.

■ In view of the foregoing, we believe that the modified objective standard, despite being well-intentioned, exacts too much of a cost in the form of added complexity in seeking to solve the problems associated with the preexisting objective and subjective standards while at the same time remaining faithful to the laudable purposes behind such standards. On balance, we believe that the objective standard provides a better, simpler, and more equitable analytical process that preserves the ideals and addresses the concerns involved in the ICA's crafting of the modified objective standard for three reasons.

First, as previously noted, the dispositive issue raised by the part (b) causation question is necessarily conjectural, in that no one, including the patient, much less the factfinder, can provide a definitive answer regarding what decision the plaintiff-patient would have made with respect to undergoing treatment had the plaintiff-patient been properly informed by his or her physician of the risks associated with the treatment. This is the "impossibility" noted by the ICA in *Leyson.* As one commentator has noted:

> As with the standards for disclosure, there are different approaches to the criterion for causality. One point of view emphasizes the unfairness to practitioners involved in gauging what might have happened by what patients say they would have done had the risk information been disclosed. The patient-plaintiffs are thus placed in a unique position and allowed to state in court that, after all is said and done, in retrospect they would not have agreed to treatment. Patients cannot divorce their re-created decision process from hindsight. The same difficulty will trouble triers of fact. No one can be really certain that a patient would have withheld consent at the time if he or she had known the undisclosed facts. Moreover, if the patient should die as a result of the procedure, reliance upon such a test of causality as this would probably preclude recovery altogether.

F. Rozovsky, *Consent to Treatment,* § 1.13.4, 62–63 (1984). With this in mind, we acknowledge the potential prejudice to a defendant physician associated with the application of a purely subjective standard and recognize the

---

and a *modified objective standard of disclosure.* ").

4. Weighing the options presented for the standard applicable to the causation question, the *Cornfeldt* court noted:

> Again, however, a number of courts have taken a different approach and adopted an objective test of proximate cause: Whether a reasonable person in the plaintiff's position would have refused the treatment had he [or she] been informed of the undisclosed risk. The objective test is the preferable measure of probable

[sic] cause. It is probably the test a jury applies in evaluating the credibility of a patient's testimony under the subjective standard. Moreover, if the patient is unable to testify, as in this case, reconstruction of his [or her] hypothesized state of mind seems a harsh evidentiary requirement. But if the patient is available to testify, the subjective test exposes the physician to the patient's perhaps bitter evaluation in light of the unsuccessful treatment of what he [or she] would have decided.

*Cornfeldt,* 262 N.W.2d at 701.

need for allowing the factfinder to assess the causation issue from an objective standpoint. We therefore agree with the rationale behind the adoption of the objective standard, discussed previously, in that notions of pragmatism and fundamental fairness necessitate grounding the part (b) causation analysis on a foundation of objectivity and reasonableness.

Second, the objective standard is consistent with the prevailing standard, applicable in negligence actions generally, which measures the conduct of the person in question against that of a "reasonable [person] in like circumstances." Restatement (Second) of Torts § 283 (1965), at 12; *see also DiCenzo v. Izawa,* 68 Haw. 528, 540, 723 P.2d 171, 178 (1986) (applying Restatement (Second) of Torts § 283); *Young v. Price,* 47 Haw. 309, 314 n. 8, 388 P.2d 203, 207 n. 8 (1963) (applying identical 1948 version of same); *see also* 1 S. Pegalis and H. Wachsman, *American Law of Medical Malpractice,* § 2.15, 103–104 (1980) (criticizing subjective test as being "not truly in step with negligence concepts where conduct is generally judged by reference to the 'reasonable [person]' ").

Finally, employing an objective standard will not substantially affect the nature or amount of the detail regarding the characteristics or circumstances that the factfinder is allowed to consider in determining part (b) causation. In this sense, the "modified objective standard" does not differ significantly from the objective standard, which assesses the plaintiff-patient's conduct in question against the standard of a "prudent person *in the patient's position."*

In *Bernard,* when elucidating the foundation and development of the modified objective standard, the ICA noted:

> In *Leyson v. Steuermann, supra,* this court opted to apply a "modified objective standard" that determines causation "from the viewpoint of the actual patient acting rationally and reasonably." As pointed out by the authors of *Prosser and Keeton [on Torts,* § 32 (5th ed. 1984) [hereinafter *Prosser and Keeton* ]], this approach is a reasonable compromise between the subjective and objective standards, both of which have their disadvantages:

>> As a compromise, an objective-subjective mix might reasonably be adopted, substituting an "ordinary" patient for the "reasonable" one, and *taking account of the patient's individual fears and beliefs in considering "the patient's position."* Such an approach would maintain a basically objective structure for the issue, leaving it capable of reasoned adjudication, yet would also protect the basic individuality and autonomy of *idiosyncratic patients* who are in fact injured by insufficient disclosure.

>> *Prosser and Keeton* § 32, at 192.

> *Bernard,* 79 Hawai'i at 384, 903 P.2d at 689 (emphases added).

As may be discerned from the ICA's application of the modified objective standard in *Bernard,* the "subjective" aspect of the "modified objective standard" essentially is effectuated by allowing the factfinder to consider the plaintiff's individual characteristics or the peculiarities of the plaintiff's situation at the time the plaintiff makes the decision to undergo treatment. The ICA took special note of the facts that: (1) when Bernard visited Dr. Char's office on the occasion in question, Bernard "was in excruciating pain and wanted to be put out of his misery"; and (2) Bernard was unemployed and had no dental insurance. *Bernard,* 79 Hawai'i at 384, 903 P.2d at 689.

We believe that, under the objective standard, the factfinder would be permitted to consider characteristics such as those noted by the *Bernard* court, as well as what Prosser and Keeton have termed "individual fears and beliefs ... of idiosyncratic patients." For example, in *Fain v. Smith,* 479 So.2d 1150, 1155 (Ala.1985), cited by Prosser and Keeton, the Alabama Supreme Court noted:

> The great preponderance of jurisdictions follows the 'reasonable person' standard of causality, which is perceived as a much more fair standard to both plaintiffs and defendants. This standard is based on what a reasonable person in the patient's position would have done had risk information been disclosed. What a reasonable person would agree to depends in large measure on the facts and surrounding cir-

cumstances of an individual case. The standard reflects the view that obtaining consent must be accomplished on a case-by-case basis, taking into account the *peculiar needs and concerns of each patient....*

. . . . .

We note ... that the objective standard requires consideration by the factfinder of what a reasonable person *with all of the characteristics of the plaintiff, including his idiosyncrasies and religious beliefs,* would have done under the same circumstances.

*Id.* at 1155 (quotation marks and citation omitted).[5]

Therefore, the primary practical difference between the objective standard and the modified objective standard is the method by which the characteristics of the actual patient are considered in the causation analysis. In applying the objective standard, the core viewpoint or standard from which the part (b) causation question is determined is that of a reasonable person. The characteristics of the actual patient are subsequently engrafted upon that core, and the standard undergoes reasonable and appropriate modification to accommodate the individual characteristics of the patient and the factual circumstances of the particular case in determining whether the patient would or would not have undergone the medical treatment or procedure that· ultimately caused his or her injury.

On the other hand, in applying the modified objective standard, the actual patient's characteristics are utilized in order to form the core viewpoint or standard from which the causation question is determined. The factfinder must then attempt to conceive from the viewpoint of the actual patient what that patient would have done had the patient been acting rationally and reasonably. In other words, after forming the core viewpoint of the actual patient using the evidence brought out at trial about the actual patient, ·

the factfinder must then attempt to engraft the characteristics of a reasonable person upon the actual patient to determine whether the patient would have consented to the medical treatment or procedure that caused his injury.

The practical benefits gained by application of the objective standard, therefore, are primarily uniformity and ease of application. First, viewing the question from a core of reasonableness establishes an initially uniform standard among cases from which adjustments for idiosyncracies may be made. Under this rationale, the analytical exercise is grounded in objective reasonableness, but the standard may still flexibly accommodate the individual characteristics of each patient.

Likewise, the initial uniformity in the analysis accorded by the objective standard makes the standard easier to apply. In determining the causation question, we believe it is easier for the factfinder to first conceptualize the abstract concept of the reasonable person and to subsequently make adjustments to accommodate the individuality of the particular patient and the circumstances surrounding the case than it is to require the factfinder to first determine the psyche of the actual patient, with all of its complexities, idiosyncrasies, and inevitable irrationalities, and then to attempt to impose the overlay of the reasonable person in appropriate degrees to each of the characteristics. In other words, we believe that it is easier—and as equitable—to determine whether a reasonable person with Bernard's characteristics would have consented to an ultimately injurious medical procedure or treatment than it is to determine whether Bernard himself would have consented under the same circumstances had he been acting rationally and reasonably.

■ Accordingly, as previously discussed, because application of the objective standard to the facts of the present case would not preclude consideration by the factfinder of

---

5. As to the effect of the plaintiff-patient's testimony, the *Fain* court noted:
   We also emphasize that by adopting this standard, we do not suggest that the plaintiff cannot testify as to what he would have done if full disclosure had been made. His testimony, albeit hindsight, is material and relevant and entitled to be considered by the jury. It simply is not conclusive of the causation issue.
   *Fain,* 479 So.2d at 1155.

any of the facts considered by the ICA in its opinion in the present case, the ICA correctly concluded that "there was sufficient evidence ... for a jury to find that, had Plaintiff been advised of the risks of tooth extraction, he would ... have chosen to undergo the more expensive but much less risky root canal procedure which Dr. Char had recommended."

We therefore hold that the question of part (b) causation in an action based on the doctrine of informed consent is to be judged by an objective standard, that is, whether a reasonable person in the plaintiff-patient's position would have consented to the treatment that led to his or her injuries had the plaintiff-patient been properly informed of the risk of the injury that befell him or her.

## III. CONCLUSION

For the foregoing reasons, the judgments and orders of the First Circuit Court are affirmed. To the extent that the ICA's opinion is in conflict or may be construed as being in conflict with this opinion, the ICA's opinion is expressly overruled.