50 P.3d 946

Lou Ann BARCAI, as the Administrator of the Estate of Francis L. Barcai; Lou Ann Barcai, on behalf of Kekoa Barcai, a minor, Kalei Barcai, a minor, Kanoe Barcai, a minor; Karen Gushiken; Richard Barcai; and Melvin Barcai, Plaintiffs–Appellants,

v.

Jon BETWEE, M.D., Defendant–Appellee.

No. 21486.

Supreme Court of Hawai'i.

July 18, 2002.

Michael K. Tateishi, Shannon S. Okada, and Glen R. Pascual (of Tateishi & Associates); Steve Noufer (of Noufer & Brown), on the briefs, Wailuku, for plaintiffs-appellants.

Gary N. Hagerman, Hilo, and Paul K. Hamano, on the briefs, for defendant-appellee.

MOON, C.J., LEVINSON, and, NAKAYAMA, JJ.; ACOBA, J., concurring separately, with whom RAMIL, J., joins.

Opinion of the Court by MOON, C.J.

Following a jury trial in this medical malpractice case, plaintiffs-appellants Lou Ann Barcai, as Administrator of the Estate of Francis Barcai (Barcai); Lou Ann Barcai, on behalf of minors Kekoa Barcai, Kalei Barcai, and Kanoe Barcai; and Barcai's siblings Kanani Barcai, Karen Gushiken, Richard Barcai, and Melvin Barcai [hereinafter, collectively, Plaintiffs] appeal the March 9, 1998 judgment of the Second Circuit Court, the Honorable Shackley F. Raffetto presiding, in favor of defendant-appellee Jon Betwee, M.D. (Dr. Betwee). Plaintiffs contend that: (1) they were denied the right to a fair and impartial jury because they conducted jury selection in reliance upon the trial court's ruling on a motion in limine that it reversed after the jury was impaneled; (2) the trial court erred by excluding testimony of their expert witness allegedly constituting a "new opinion" that was not disclosed during discovery; and (3) the trial court erred by refusing to instruct the jury on their claim that Dr. Betwee negligently failed to obtain Barcai's informed consent before treating him with antipsychotic medication. For the reasons discussed herein, we reject the first two points of error, but vacate the judgment in part with respect to the third point of error and remand this case to the trial court for further proceedings.

## I. INTRODUCTION

On June 11, 1990, Barcai, then 45 years old, presented to the emergency department of the Maui Memorial Hospital (MMH) in a psychotic state. Barcai had apparently been violent, was having auditory hallucinations, and arrived via ambulance in restraints. Barcai received four doses of haloperidol, an antipsychotic medication, that was ordered by the emergency room physician. Thereaf-

ter, Barcai became calmer and consented to a voluntary admission to the psychiatric unit.

Dr. Betwee, a psychiatrist, assumed care of Barcai and saw him the following day on June 12, 1990. At approximately noon that day, Barcai became mute, appeared stiff and unresponsive, and had an unusual heart murmur. Shortly thereafter, Barcai became alert, was walking around, and his heart murmur had resolved. Concerned that Barcai had an undiagnosed medical problem, Dr. Betwee arranged for Barcai to be transferred to the medical ward under the care of Marconi Dioso, M.D. (Dr. Dioso), an internist. Barcai's appearance improved dramatically over the course of the following day, and, after further diagnostic tests and medical evaluation failed to reveal any additional medical problem, Barcai was transferred back to the psychiatric ward on the afternoon of June 13, 1990. Dr. Dioso's assessment of Barcai's unusual appearance was that Barcai had suffered an "extrapyramidal" reaction from the antipsychotic medication that was administered in the emergency department. Extrapyramidal reactions, of which there are several types, are a generally non life-threatening and treatable side effect of antipsychotic (also referred to as "neuroleptic") medications. *See generally Attorney's Textbook of Medicine* § 106.25 (3rd ed.2001).

While Barcai was on the medical ward, Dr. Dioso also consulted with Paul Kershaw, M.D. (Dr. Kershaw), a neurologist. On June 13, Dr. Kershaw entered a short handwritten note in the medical record also indicating his assessment that Barcai had an suffered from an extrapyramidal reaction. He dictated a more substantial consultation report that was later typewritten and placed in the record, which also stated that Barcai's symptoms were "somewhat suggestive of neuroleptic malignant syndrome. These symptoms have resolved with withdrawal of neuroleptic medication." Neuroleptic malignant syndrome (NMS), discussed in more detail *infra*, is a relatively rare but potentially serious complication of antipsychotic medication that at the time of Barcai's hospitalization, was thought to be fatal in approximately four to twenty nine percent of cases. *See* Gerard Addonizio and Virginia Lehmann Susman, *Neuroleptic*

*Malignant Syndrome: A Clinical Approach* 7–8, 87–88 (1991).[1] Early recognition of NMS and discontinuation of the offending antipsychotic medication is critical; in general, it is thought that the earlier the signs and symptoms of NMS are recognized and the offending medication is stopped, the better the patient's chances for survival. *See id.* at 52.

After returning to the psychiatric ward on June 13, Barcai initially appeared alert, but he soon began having symptoms of panic and anxiety. Gradually over the next several days, his behavior deteriorated. After unsuccessfully attempting to ameliorate Barcai's symptoms with other types of medications, Dr. Betwee prescribed Stelazine, an antipsychotic medication, on June 19, 1990. Over the next eight days, Barcai's condition appeared to improve at times, but at other times, he appeared worse; further details are discussed *infra.* Early in the morning on June 27, 1990, Barcai was found dead. The pathologist who performed the autopsy was unable to identify the cause of Barcai's death.

On December 16, 1992, Plaintiffs filed a complaint against Dr. Betwee and MMH that was subsequently amended and clarified to allege: (1) medical negligence, for the failure to diagnose and treat NMS after antipsychotic medication was restarted on June 19, 1990, which Plaintiffs claim was the cause of Barcai's death; (2) false imprisonment, for confining Barcai to the hospital and placing him in seclusion within the hospital; (3) battery, for restraining Barcai and administering medications to him without his consent; (4) negligent infliction of emotional distress (NIED); and (5) negligent failure to obtain informed consent before treating Barcai with antipsychotic medication. Plaintiffs sought special and general damages for Barcai's pain, suffering and emotional distress, the emotional distress and loss of companionship, support and affection of Barcai's minor children, and the emotional distress of Barcai's siblings. Before trial, the trial court granted MMH's motion for summary judgment on some of Plaintiff's claims; the remainder of

the claims against MMH were dismissed upon stipulation of the parties. Thus, the trial proceeded as to Dr. Betwee, the only remaining defendant.

Prior to trial, Plaintiffs brought a motion in limine to exclude evidence of Barcai's history of violence and a previous psychiatric hospitalization. The trial court granted the motion at a hearing that was held prior to jury selection. Upon reconsideration the following day—after the jury was impaneled—the trial court reversed its ruling.

Prior to trial, the defense also sought to exclude testimony concerning purported "new opinions" offered by Plaintiffs' expert witness that the expert had not expressed earlier in his deposition. The trial court granted the defense's motion in limine.

Trial commenced on October 6, 1997, and concluded on October 31, 1997 with the jury finding in favor of Dr. Betwee; final judgment was entered on March 9, 1998, and Plaintiffs timely appealed. Additional background facts are presented as appropriate in the discussion that follows.

## II. *DISCUSSION*

### A. *The Trial Court's Reversal of its Ruling Concerning Barcai's Prior Acts and Barcai's Right to a Fair and Impartial Jury*

#### 1. Background facts

As previously stated, Plaintiffs filed a motion in limine, seeking to exclude evidence of Barcai's prior violent acts. Specifically, Plaintiffs sought to exclude Barcai's history of violence related to, *inter alia:* (1) domestic violence involving his wife, Lou Ann Barcai, as well as his first wife; (2) a fight with his brother Melvin Barcai and a police officer; (3) a terroristic threatening charge involving his sister, Karen Gushiken; and (4) a terroristic threatening and assault conviction arising from an incident that occurred on December 11, 1988. Plaintiffs also filed a separate motion in limine to exclude any refer-

---

**1.** Gerald Addonizio, who co-authored this book, testified as an expert witness in this case, and the

book was admitted into evidence.

ence to Barcai's hospitalization at the Hawai'i State Hospital in 1989.

The court held a hearing on Plaintiffs' motions on October 6, 1997, prior to jury selection. During argument on Plaintiffs' motion to exclude evidence of past violence, the court asked, "Isn't anything that the doctor knows about the behavior of a psychiatric patient relevant to what [the doctor] does?" Plaintiffs responded that Dr. Betwee had not based his treatment decisions on Barcai's past behaviors. Defense counsel conceded that Dr. Betwee's medication decisions were not based on Barcai's past behaviors, but pointed out that Dr. Betwee's knowledge of Barcai's past behaviors had an impact on his decision to order restraint and seclusion. The defense argued that Barcai's predilection to violence was, therefore, relevant to Plaintiffs' claims of false imprisonment and battery. In response, Plaintiffs offered to dismiss these claims with prejudice. Based primarily on this offer, the court ruled that Barcai's history of violence would not be admissible.

Following the hearing on these and other motions in limine, the parties proceeded to jury selection, and the jury was sworn in later that afternoon. Opening statements were scheduled for the following morning.

The next day, the parties met before opening statements to review issues concerning the motions in limine. Defense counsel in effect asked the court to reconsider its ruling as to the admissibility of Barcai's prior violence, now contending that Dr. Betwee would testify that he had taken this history into account when treating Barcai. Defense counsel also pointed out that Plaintiffs had already agreed that the medical record pertaining to the hospitalization at issue in the case could be admitted into evidence and that this record contained references to Barcai's history. In fact, a portion of the medical record that had been previously offered and stipulated as being admissible into evidence by both parties re-

ferred to the fact that Barcai had been "committed to HSH" (Hawai'i State Hospital) in 1982, that he had been arrested after assaulting and threatening a police officer in 1988, thereafter remained "jailed" from December 1988 to August 1989, and that he had spent an additional thirty days at "HSH" during this time period. These references are contained within a few lines on a single hand-written doctor's progress note that constitutes one page out of over one hundred and fifty pages of medical records from Barcai's hospitalization at MMH. The legibility of the handwriting is marginal at best and also contains medical shorthand.

Plaintiffs argued that it would not be fair for the court to change its ruling on the motion in limine because, had they known that evidence of prior violence was going to be admissible, they would have questioned potential jurors differently. Notwithstanding Plaintiffs' argument, the court "reversed" itself, ruling that the information was admissible:

> it seems to me in a psychiatric case that all of the behavior that the doctor actually knew about, prior behavior of the decedent, is relevant when he is making a consideration—making a decision about psychoactive drugs, whatever the correct term is, because he needs to know what level of behavior is involved. If he made a mistake, that's a different issue.

During the course of the trial, the aforementioned doctor's progress note was admitted into evidence without comment as to any of its contents.[2]

### 2. Standard of Review

 Whether there has been a denial of the right to a fair and impartial jury is an issue of law. Issues of law are reviewed under the right/wrong standard. *Lee v. Corregedore*, 83 Hawai'i 154, 158, 925 P.2d 324, 328 (1996).

---

2. Two copies of the progress note were actually admitted into evidence. The defense offered one copy as part of a large bound volume of Barcai's medical records containing one hundred and fifty-two pages of material, and Plaintiffs offered

the page as part of a twelve page exhibit. Plaintiffs also moved over forty exhibits into evidence, fifteen of which consisted of various portions of Barcai's medical record.

476

### 3. Analysis

■ Plaintiffs contend that the trial court's reversal of its initial ruling to preclude evidence of Barcai's history of violence substantially impaired their right to a fair and impartial jury. Plaintiffs submit that they relied on the court's initial ruling during jury selection and, as a result, they did not attempt to eliminate those potential jurors who may have been biased against Barcai due to his history of violence. Plaintiffs contend that they were, therefore, deprived of their right to "an informed exercise" of their peremptory challenges and their ability to challenge jurors for cause.

Plaintiffs' contention is specious. Assuming *arguendo* that Plaintiffs were deprived of an "informed exercise" of their right to participate in jury selection, it was only with respect to a single issue: the ability to ascertain whether potential jurors would be predisposed to judge Barcai harshly because of his history of violence. Notably, however, Plaintiffs do not point to anywhere in the record where evidence of Barcai's past violent behavior was discussed at trial. Thus, even assuming there were jurors predisposed to judge Barcai harshly because of his past behavior, Plaintiffs do not demonstrate where such jurors had an opportunity to do so and how it may have affected the outcome of the trial. Consequently, Plaintiffs have failed to demonstrate even a remote possibility of prejudice to them. *Cf. Kawamata Farms v. United Agri Products*, 86 Hawai'i 214, 245, 948 P.2d 1055, 1086 (1997) (judgment will not be reversed based upon error in awarding the correct number of peremptory challenges to co-defendants unless the error is shown to be prejudicial); *Kaowili v. Raymark Industries, Inc.*, 68 Haw. 640, 644, 727 P.2d 67, 69 (1986) (trial court "committed prejudicial error" necessitating a new trial when it made statements or asked questions during voir dire which implied or stated a conclusion as to the central fact issue in the case).

Plaintiffs rely upon broad language—derived from a secondary source—cited in *Carr v. Kinney*, 41 Haw. 166 (1955), to support their apparent contention that they do not need to demonstrate any such prejudice:

To obtain an impartial jury an examination into the qualifications, attitudes and inclinations of jurors before they are impaneled and sworn to try a case is necessary. Only by such examination can the information be obtained to constitute a basis for the exercise of a challenge to exclude from the jury those who might act from prejudice or interest or without qualification to judge soundly, and wide latitude is permitted an attorney in examining jurors on their voir dire to discover the state of mind of the juror with respect to the matter in hand or any collateral matter reasonably liable to unduly influence.

*Id.* at 168–69 (citing 31 Am.Jur., Jury, §§ 104 and 107). *Carr*, however, does not stand for the expansive proposition that Plaintiffs would have this court follow.

In *Carr*, the plaintiff, in a personal injury suit, was prohibited from asking potential jurors during jury selection any questions relative to their interests in two insurance companies that insured the defendant or "any questions involving insurance in any form." *Id.* at 168. This court held that the restriction on the plaintiff constituted reversible error. *Id.* at 179. However, the primary focus of the analysis was upon the defendant's contention that, if the suggestion was raised that a defendant was insured, then jurors would not be able to impartially judge the case and would be inclined to decide "too easily in favor of the plaintiff" or award the plaintiff "a larger amount in damages than they otherwise would." *Id.* at 170 (internal quotation marks omitted). This court reasoned that it is "widely known" by jurors that many individuals carry insurance policies and that it was an "insult to the intelligence and the fidelity of jurors and to the jury system as a whole" to assume that jurors would automatically decide a case against an insured defendant based solely on the fact that the defendant carried insurance. *See id.* at 170–71 (emphasis omitted).

Significantly, this court noted the distinct possibility that individual members of the jury panel could have had a financial interest in one of companies that insured the defendant, given the fact that the company was owned in large part by one of Hawai'i's largest employers. *See id.* at 173. Moreover, the court noted that, in fact, "two of the employees of this corporation holding stock in the insurance company were listed on the

jury panel[.]" *Id.* The court further reasoned that:

> Were the plaintiff permitted to thoroughly examine the prospective jurors it might readily appear that some one or more of the jury panel might have large interests in such holding companies or be employees thereof or have pending business with these companies or with the insurance company itself.

*Id.* at 173–74. It is clear, therefore, that the court's decision in *Carr* rested upon its perception that there existed a significant likelihood of prejudice to the plaintiff as a result of her inability to ask questions concerning the financial interests of potential jurors in the companies that insured the defendant. *See, e.g., id.* at 172 ("it is proper to ascertain fully the relationship of any prospective juror to the parties interested in the outcome of the case so as to enable counsel to exercise intelligently his right to peremptorily challenge") (citing *Tucker v. Kollias,* 223 Mo. App. 367, 16 S.W.2d 649, 651 (1929) (internal quotation marks omitted)). The facts of this case are in no way similar to the situation in *Carr,* and Plaintiffs' reliance upon dictum in *Carr* is not persuasive, especially where they have failed to point to anything in the record suggesting that the harm they sought to guard against—evidence addressing Barcai's past violent behaviors—ever actually arose at trial.[3]

Indeed, the only evidence of past violence, of which we are aware, that *was* admitted— which Plaintiffs do not refer to in their brief—is the doctor's progress note that *Plaintiffs themselves* offered into evidence *before* the court's initial ruling on their motion in limine. Even if Plaintiffs had specifically advanced a claim of prejudice resulting from the admission of this evidence, such a claim would be fruitless because they themselves offered the evidence. *Cf. Condron v. Harl,* 46 Haw. 66, 81, 374 P.2d 613, 621 (1962) (litigant could not complain of prejudice resulting from receipt of evidence that he invited the trial court to erroneously admit); *Kanoii v. Kaioipahia,* 11 Haw. 326, 330 (1898) (a litigant introducing evidence without objection cannot thereafter raise on appeal the question of the admissibility of such evidence). Therefore, Plaintiffs could not have relied upon the trial court's initial ruling in the first place to assume that they did not have to question potential jurors about their attitudes towards violence and cannot now blame the trial court for their own decision not to do so.

Based on the foregoing, we hold that Plaintiffs' right to a fair and impartial jury was not violated.

**B.** *Motion in Limine Concerning Exclusion of Purported New Opinions of Plaintiffs' Expert Witness*

**1. Background**

Plaintiffs' final witness list indicated that Cal Cohn, M.D. (Dr. Cohn), would testify as

---

**3.** Plaintiffs' reliance on other authority is similarly inapposite. In *Hornsby v. Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints,* 758 P.2d 929 (Utah Ct.App. 1988), as in *Carr,* the appellate court held it to be reversible error where the trial court refused to permit the plaintiff to question potential jurors concerning their relationship with the defendant. *See Hornsby,* 758 P.2d at 933. In *Barrett v. Peterson,* 868 P.2d 96 (Utah Ct.App.1993), the appellate court, in order to balance the "competing interest of selecting an impartial jury" with "the traditional reluctance" of trial courts to allow questions that would prejudice defendants by "infus[ing] the issue of insurance coverage into jury deliberations," *id.* at 98, applied a two-step pre-existing framework for determining the voir dire process to be followed when a plaintiff seeks to ascertain whether potential jurors have been exposed to tort reform campaigns or advertisements by industry defendants. *See id.* at 99–103. Applying this framework, the court concluded that the plaintiff had made an "initial showing of prejudice" when he provided specific, widely distributed articles and advertisements to which the jurors may have been exposed. *See id.* at 102. Because the trial court neither asked, nor permitted the plaintiff to ask, questions concerning the jurors' exposure to such materials, the appellate court concluded that the plaintiff's right to an informed exercise of his peremptory challenge was substantially impaired. *See id.* As in *Carr,* and unlike the instant case, the outcome of *Barrett* was thus premised on an analysis that concluded that there was a significant likelihood of prejudice to the plaintiffs. Finally, Plaintiffs' citation to a concurring opinion in a criminal case, *State v. Pokini,* 55 Haw. 640, 526 P.2d 94 (1974), is also inapposite. The concern in *Pokini* focused upon the extent of voir dire necessary in a criminal case that had extensive pretrial publicity, *see id.* at 641–44, 526 P.2d at 98–101, and, as such, is significantly different from this case.

to his opinion of Dr. Betwee's treatment of Barcai. In an oral deposition taken on September 20, 1994, three years before trial, Dr. Cohn testified that he believed Barcai had NMS during the three days prior to his death. Dr. Cohn testified that there is no one sign or symptom that is characteristic for a diagnosis of NMS, but, rather, the diagnosis is established by a "constellation of symptoms[,]" including elevated temperature, muscle rigidity, progressive mental confusion, certain diagnostic tests, and "autonomic lability," which Dr. Cohn described as "blood pressure and pulse bouncing around." Dr. Cohn testified that he believed Dr. Betwee's care was substandard during the final days of Barcai's life (after initiation of the antipsychotic medication on June 19) because Dr. Betwee did not take action when Barcai became increasingly confused, his blood pressure became "somewhat more labile[,]" his pulse became elevated, and he had periods of muscle rigidity. In addition, Dr. Cohn testified that Dr. Betwee should have considered NMS because, *inter alia*, Dr. Kershaw, the neurology consultant, had raised the possibility of the diagnosis earlier in Barcai's hospitalization and because Dr. Dioso had written in the medical record on June 25, 1997 that it was unclear why Barcai's blood pressure and pulse were elevated at that time. Dr. Cohn testified that "the blood pressure and the pulse should have been part of the red flag." Dr. Cohn further opined that Dr. Betwee should have considered obtaining a second opinion from another psychiatrist, re-consulting with Dr. Kershaw, discontinuing Barcai's antipsychotic medications, and obtaining further diagnostic tests. In response to questioning from defense counsel, Dr. Cohn affirmed that the foregoing relevant facts, and none other, constituted the basis for his opinion of Dr. Betwee's care.

On February 27, 1995, pursuant to a scheduling conference with the parties, the trial court ordered that, with the exception of certain discovery matters, which are not at issue here, "there shall be no further discovery between now and trial, except as agreed by counsel or by further order of the court." Apparently, at a June 1997 hearing on then-codefendant MMH's motion for summary judgment, counsel for MMH argued that Plaintiffs were presenting new opinions of Dr. Cohn that had not been expressed earlier. The purported opinions apparently concerned the hospital's liability and did not address Dr. Betwee's treatment. In response, by letter to MMH dated August 4, 1997, Plaintiffs offered to have MMH re-depose Dr. Cohn; counsel for Dr. Betwee also received a copy of the letter. On August 7, 1997, counsel for Dr. Betwee informed Plaintiffs by letter that he would not agree to any further discovery because "Dr. Cohn has given his opinions as stated in his deposition and to allow further discovery would only raise the need for further discovery of all experts."

On October 3, 1997, the Friday before the trial week, Plaintiffs filed and served their opinion questions. Among the questions to be asked of Dr. Cohn and his expected answers were the following:

3. Assuming Dr. Betwee disagreed with the statement in Dr. Kershaw's consultation report that Francis Barcai's symptoms were suggestive of NMS, was it below the standard of care not to speak or communicate with Dr. Kershaw?

Answer: Yes. Under the circumstances and in light of the risks presented by NMS.

9. Should Dr. Betwee have obtained a second opinion?

Answer: Yes. See answer to no. 3.

. . . .

20. Should the hypertension experienced by Francis Barcai between June 19 and June 25, 1990 [have] been treated?

Answer: Yes.

21. Was Dr. Betwee's failure to treat the hypertension below the standard of care?

Answer: Yes.

. . . .

26. Was Dr. Betwee's failure to take the following measures the proximate cause of Francis Barcai's death?

1. Diagnose NMS.
2. Stop neuroleptics.
3. Adequately address hypertension.
4. Treat the NMS.

Answer: Yes, because if he had diagnosed NMS, stopped the neuroleptic or otherwise treated the NMS, and adequately address [sic] the hypertension, then it is probable that Francis Barcai would not have died due to complications from NMS.

The defense moved to preclude evidence of "new opinions" by Dr. Cohn that had not been previously expressed in his oral deposition. At the hearing on the motion, Plaintiffs argued that testimony concerning treatment of hypertension was not a "new opinion" because hypertension is a symptom of NMS and was, therefore, "subsumed" within Dr. Cohn's oral deposition testimony when he discussed Dr. Betwee's failure to recognize NMS. Although the trial court deferred ruling on the matter, it stated that "I am going to grant the [defense] motion unless [Plaintiffs] can go back to the deposition and show me where that[ 4] was mentioned."

In response to the court's inquiry the following morning, Plaintiffs indicated they had checked the record, but did not provide the court with any citations to or excerpts from Dr. Cohn's deposition testimony concerning hypertension. At the same time, the defense sought to expand the motion in limine to preclude Dr. Cohn from testifying that Dr. Betwee should have obtained a second opinion, arguing that Dr. Cohn had not previously provided this opinion in his deposition. Plaintiffs argued that the defense had no right to complain because it had not submitted interrogatories seeking to clarify Dr. Cohn's opinions when it learned in August, two months earlier, that there was an issue concerning the completeness of those opinions. Without elaboration, the trial court granted the defense's motion.

## 2. Standard of Review

■ Generally, the decision whether to admit expert testimony rests in the discretion of the trial court. *See Aga v. Hundahl,* 78 Hawai'i 230, 238, 891 P.2d 1022, 1030 (1995). To the extent that the trial court's decision is dependant upon interpretation of court rules, *see infra,* such interpretation is a question of

law, which this court reviews de novo. *See Molinar v. Schweizer,* 95 Hawai'i 331, 334–35, 22 P.3d 978, 981–82 (2001).

## 3. Analysis.

Plaintiffs contend that the trial court reversibly erred when it granted the defense's motion in limine to preclude Dr. Cohn from testifying that Dr. Betwee's failure to treat Barcai's elevated blood pressure fell below the standard of care. Plaintiffs argue that, contrary to the defense's assertion, such testimony was not a "new opinion," and, even if it was, Plaintiffs were not required to supplement Dr. Cohn's deposition testimony because the defense never requested it. We disagree.

a. *whether Dr. Cohn's testimony that Dr. Betwee's failure to treat hypertension fell below the standard of care constituted a new opinion*

■ Plaintiffs maintain that Dr. Cohn's proffered trial testimony was not a new opinion because his deposition testimony that Dr. Betwee should have recognized hypertension as a sign of NMS encompasses an opinion that Dr. Betwee also should have treated it. The record clearly indicates that the trial court afforded Plaintiffs an opportunity to demonstrate that Dr. Cohn had previously opined on the need to treat Barcai's hypertension. However, Plaintiffs failed to provide the court with any specific deposition testimony on the matter. It was not the trial court's responsibility to comb through pages of deposition testimony to locate Dr. Cohn's specific earlier words; this task belongs to counsel. *Cf. Larsen v. Pacesetter Systems, Inc.,* 74 Haw. 1, 46, 837 P.2d 1273, 1295 (1992) ("In failing to object to the witnesses' competence at trial, Pacesetter deprived the court of any opportunity to cure the alleged error and waived the right to raise the question on appeal."). Accordingly, we hold that Plaintiffs waived any objection to the trial court's ruling that effectively concluded that

---

4. Although not entirely clear, presumably, the word "that" refers to hypertension or the treat- ment thereof.

the testimony at issue was a new opinion not revealed at the deposition.[5]

### b. *whether Plaintiffs were required to supplement Dr. Cohn's deposition testimony*

■ Plaintiffs contend that, assuming Dr. Cohn's proffered trial testimony regarding the failure to treat Barcai's hypertension constituted a new opinion, Plaintiffs were under no obligation to inform the defense of this new opinion because the defense did not serve any requests for answers to interrogatories, production of documents, or admissions. Plaintiffs point out that, in August 1997, when the defense became aware of then-codefendant MMH's claim that Dr. Cohn was providing a new opinion, Plaintiffs offered to have Dr. Cohn re-deposed, but defense counsel "buried his head in the sand" and refused to conduct further discovery. Plaintiffs assert that the defense's "intentional refusal to discover" new information should not be rewarded.

HRCP Rule 26(e) (1998) describes a party's duty to supplement responses to discovery requests:

(e) **Supplementation of Responses.** A party who has responded to a <u>request for discovery</u> with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:

(1) <u>A party is under a duty seasonably to supplement his response with respect to any question directly addressed to</u> (A) the identity and location of persons having knowledge of discoverable matters, and (B)

the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, <u>and the substance of his testimony</u>. (Bold emphasis in original.) (Underscored emphases added.) At the September 20, 1994 oral deposition, Dr. Cohn indicated that his testimony encompassed all of the reasons upon which he based his opinions with respect to the care rendered to Barcai. Once the deposition was completed, HRCP Rule 26(e)(1)(B) clearly imposed upon Plaintiffs an affirmative duty to supplement Dr. Cohn's previous answers if the answers would be different at trial.

Plaintiffs appear to argue that the language of HRCP Rule 26(e)(1) requires supplementation only when the question is "directly addressed" by way of interrogatory or requests for production of documents or admissions. However, the language of the rule applies more broadly to all methods of discovery, including oral depositions. The first paragraph of the rule refers to a party "who has responded to a request for *discovery* . . . ." (Emphasis added.) An oral deposition is a method of discovery. HRCP Rule 26(a).[6] Similarly, the term "response" in HRCP Rule 26(e)(1) refers to this same "request for discovery" in the first paragraph of HRCP Rule 26(e); thus, the supplemental response required is a response to all methods of discovery, not just select methods such as interrogatories and requests for admissions.

■ The ICA held similarly in *Swink v. Cooper*, 77 Hawai'i 209, 881 P.2d 1277 (App. 1994). In that medical malpractice case, the plaintiff's expert testified in her deposition

---

5. Similarly, Plaintiffs assert that the trial court erred in precluding Dr. Cohn from testifying that Dr. Betwee should have obtained a "second opinion." Assuming arguendo that the trial court erred, such error would have been harmless because Dr. Cohn did testify at trial that Dr. Betwee should have re-consulted Dr. Kershaw, the neurologist. *See infra* at 481, 50 P.3d at 957. If Plaintiffs are arguing that Dr. Cohn should have been allowed to testify at trial (as he did in his deposition) that a second opinion from another *psychiatrist* was needed, it was Plaintiffs' responsibility to make the record clear. *See* Hawai'i Rules of Evidence (HRE) Rule 103(a)(2) ("Error may not be predicated upon a ruling which . . . excludes evidence unless . . . the sub-

stance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."). Thus, Plaintiffs have waived their right to challenge the trial court's ruling on this issue.

6. HRCP Rule 26(a) (1998) states:

Parties may obtain discovery by one or more of the following methods: *depositions upon oral examination* or written questions; written interrogatories; production of documents or things or permission to enter upon land or other property, for inspection and other purposes; physical and mental examinations; and requests for admission.
(Emphasis added.)

that the defendant physician had violated the standard of care in two respects: first, by performing poorly the procedure in question (correction of a "droopy" eyelid); and, second, by repeating the procedure when it did not work the first time. *See Swink*, 77 Hawai'i at 210, 213, 881 P.2d at 1279, 1281. At trial, however, the expert's testimony appeared to be heading towards criticizing the defendant's choice of the particular surgical procedure as opposed to other procedures, which would have amounted to a third theory of negligence. *See id.* at 213, 881 P.2d at 1281. The expert was precluded from testifying as to the third theory of negligence, and the plaintiff asserted this as error on appeal. *See id.* Relying upon HRCP Rule 26(e)(1)(B), the ICA held that the plaintiff had a duty to supplement her expert's deposition testimony if the expert was going to propound an "alternative theory" of liability at trial. *See id.* at 213–14, 881 P.2d at 1281–82. The ICA did not distinguish between whether the defendant originally conducted discovery through oral depositions or through interrogatories or other written requests; nor do we discern a valid reason to do so because it is "abundantly clear that complete and accurate pretrial discovery of expert witnesses is critical to a fair trial, and HRCP 26 is designed to promote candor and fairness in the pretrial discovery process and to eliminate surprises at trial." *Lee v. Elbaum*, 77 Hawai'i 446, 454, 887 P.2d 656, 664 (App.1993), *cert. dismissed*, 77 Hawai'i 489, 889 P.2d 66 (1995); *see also Barnes v. St. Francis Hospital and School of Nursing, Inc.*, 211 Kan. 315, 507 P.2d 288, 293–94 (1973) (applying a rule nearly identical to HRCP Rule 26(e) to hold that the failure of an expert witness to seasonably supplement his deposition to state an additional basis for his opinion precluded the expert from testifying as to the additional basis).

 Finally, Plaintiffs in effect assert that their duty to supplement Dr. Cohn's deposition answers was met by offering to have Dr. Cohn redeposed. We do not agree. The duty to supplement outlined in HRCP Rule 26(e) is an affirmative duty; it cannot be met by offering to have the adverse party undertake a discovery "fishing expedition" to find possible new opinions.

Moreover, the parties were bound to a trial schedule, including a discovery schedule, established by the court; it would be inefficient and unfair to disrupt this schedule by forcing the adverse party to reopen depositions to determine compliance of the supplementing party's obligation. Were such a practice allowed, every party in every case involving experts would be compelled to redepose expert witnesses up to the time of trial in order to ensure that no new opinions have been formulated since the expert's last deposition. Clearly, such practice would unfairly increase litigation costs and result in delays.

Based on the foregoing discussion, we hold that, assuming Dr. Cohn did in fact have a new opinion, Plaintiffs had an affirmative obligation to supplement Dr. Cohn's previous deposition answers and that offering to have him redeposed was not sufficient to meet that obligation. Accordingly, we also hold that the trial court did not err in excluding evidence of Dr. Cohn's purported "new opinion." *See Swink*, 77 Hawai'i at 214, 881 P.2d at 1282 ("a trial court has wide discretion to exclude an expert witness' testimony when a party has failed to supplement the expert's discovery responses").

C. *The Trial Court's Refusal to Instruct the Jury on the Tort of Negligent Failure to Obtain Informed Consent*

**1. Background**

As a result of MMH's dismissal from the case and the dismissal of the false imprisonment and battery claims against Dr. Betwee, trial proceeded with respect to the medical negligence, NIED, and negligent failure to obtain informed consent claims against Dr. Betwee on October 7, 1997. Dr. Cohn testified that the treatment by Dr. Betwee fell below the standard of care because of his failure to diagnose NMS on June 12, 1990 (when Barcai was initially transferred to the medical ward) and again on June 25, 1990 (when Barcai's condition began to deteriorate rapidly) and that Barcai's death was caused by NMS. Dr. Cohn also testified that, on or around June 21, 1990, Dr. Betwee should have consulted again with the neurologist

who saw Barcai earlier in the hospitalization. Dr. Cohn did not testify as to the incidence of NMS or as to any issue concerning informed consent.

Dr. Betwee testified that NMS was a rare complication that can occur in patients taking antipsychotic medications. He conceded that, if a patient had NMS, the first step would be to stop administering antipsychotic medications. However, Dr. Betwee testified that he did not believe that Barcai suffered from NMS when he was initially admitted to MMH or at any time thereafter. Dr. Betwee began prescribing antipsychotic medications again on June 19, 1997 because Barcai's condition was deteriorating. For example, the evidence indicated, among other things, that Barcai: (1) claimed that the devil was outside of his room, that another patient was the devil, and that he himself was the devil; (2) after being found at 2:00 AM in the shower screaming "fuck the devil," would not respond to anyone and subsequently refused to come out, curling up in a fetal position while claiming he was a baby; (3) repeatedly hid in a bathroom stall refusing to leave; (4) called police to complain that the nurses were poisoning him; (5) stretched out like a cross, murmuring "Jesus"; and (6) had to be placed, with resistance, in a locked seclusion room, whereupon he was found pacing with bedding wrapped over his head.

With respect to the issue of informed consent, Dr. Betwee testified that he did not inform patients to whom he prescribed antipsychotic medication about the risk of NMS because it was a rare occurrence, "one to three per thousand." Describing the information he typically disclosed to patients, Dr. Betwee testified as follows:

[Defense Counsel]: When you are discussing these risks that do happened [sic] with the patient, is there a barrier sometimes because of their condition?

[Betwee]: Oh, typically. If you are dealing with someone like any of us are in the courtroom, you can have a calm rationale [sic] discussion about things. If you're dealing with someone who says he's God or who is fearful of the nurses, then it's an entirely different matter.

You still have to get some information across. You want people to know something about what's likely to happen with them. But people's ability to understand information is different. It may be different from time to time.

So if people are getting neuroleptics, particularly the potent ones, things I will typically tell them are you may get these stiffness reactions that I described [earlier] and may demonstrate them to the patient.

I will tell them what to do. If they are getting a low milligram potency drug, like Thorazine I may tell them to be careful and to stand up slowly because their blood pressure could fall and they could get dizzy, and I don't want them falling down.

But typically not a lot more than that and [sic] people who are acutely ill in the hospital.

The defense also presented the testimony of Gerard Addonizio, M.D. (Dr. Addonizio), the co-author of a book devoted exclusively to NMS. *See supra* note 1. Dr. Addonizio testified that Dr. Betwee's use of antipsychotic medication was necessary and met an acceptable standard of care. Dr. Addonizio further testified that Barcai's death was not caused by NMS and that he had "absolutely no doubt" that Barcai did not have NMS during the final days of his life. On the issue of informed consent, Dr. Addonizio testified that he does not advise his own patients of the risk of NMS because,

first of all, it would scare them. And it is not a common event. It's a relatively rare event. And also patients who are getting neuroleptics where you're initiating neuroleptics are often very psychotic, and it would not be in their best interest to just further scare them and deter them from accepting needed medication.

According to Dr. Addonizio, the accepted figure for the incidence of NMS among patients taking neuroleptics at the time of Barcai's hospitalization was between 0.1 to 0.8 percent.

Like Dr. Addonizio, Richard Markhoff, M.D. (Dr. Markhoff), a psychiatrist and medical school professor, testified that he did not believe that Barcai died from NMS. Dr.

Markhoff further testified that psychiatrists generally do not tell their patients about the risk of NMS because it is a rare event.

At the conference to settle jury instructions, the defense objected to Plaintiffs' proposed instructions concerning negligent failure to obtain informed consent, essentially arguing that, because Plaintiffs did not present any testimony that Dr. Betwee had breached a standard of care in failing to disclose the risk of NMS, there was no evidence to support an informed consent claim and that the jury should not be allowed to consider it. Relying on *Carr v. Strode*, 79 Hawai'i 475, 904 P.2d 489 (1995), discussed *infra*, the trial court initially determined that sufficient evidence had been presented to allow the jury to decide whether a reasonable person would have wanted to be informed of the risk of NMS. However, the court subsequently accepted the defense's argument that Dr. Betwee had justified his nondisclosure of the risk of NMS on the basis of the "therapeutic privilege exception," discussed *infra*, *i.e.*, that it would have been harmful to Barcai to disclose the risk of NMS. Relying on *Bernard v. Char*, 79 Hawai'i 371, 383, 903 P.2d 676, 688 (App.1995) [hereinafter, *Bernard I*], the trial court ruled that expert testimony was required to rebut Dr. Betwee's therapeutic privilege justification, and, because Plaintiffs had presented no such testimony, there was insufficient evidence to send the issue of informed consent to the jury. Consequently, over the objection of Plaintiffs, the trial court refused their proposed jury instructions on informed consent.

### 2. Standard of Review

When jury instructions, or the omission thereof, are at issue on appeal, the standard of review is whether, when read together and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent or misleading. *Craft v. Peebles*, 78 Hawai'i 287, 302, 893 P.2d 138, 153 (1995) (citations omitted).

### 3. Analysis

Plaintiffs contend that the trial court erred in refusing to instruct the jury concerning the tort of negligent failure to provide informed consent. Specifically, Plaintiffs claim that Dr. Betwee never properly established at trial the "therapeutic privilege exception" to the requirement that informed consent be obtained before starting Barcai on antipsychotic medication. We agree.

Physicians have an obligation to obtain the informed consent of their patients before administering diagnostic and treatment procedures. *See Carr v. Strode*, 79 Hawai'i 475, 479, 904 P.2d 489, 493 (1995). The elements of informed consent commonly consist of ensuring that the patient consents to the prescribed procedure only after being made aware of the: (1) condition being treated; (2) nature and character of the proposed treatment or surgical procedure; (3) anticipated results; (4) recognized possible alternative forms of treatment; and (5) recognized serious possible risks, complications, and anticipated benefits involved in the treatment or surgical procedure, as well as the recognized possible alternative forms of treatment, including non-treatment. *See* HRS § 671–3 (1993). In addition, the law requires that written informed consent be obtained from psychiatric patients before providing non-emergency psychiatric treatment. *See* HRS § 334E–1 (1993). The rendering of professional medical services without informed consent is a tort. HRS § 671–1(2) (1993).

Claims for negligent failure to obtain informed consent typically arise when a plaintiff patient alleges that the defendant physician failed to warn the patient of a particular risk associated with the procedure and the particular risk ultimately occurred. To establish a claim of negligent failure to obtain informed consent under Hawai'i law, the plaintiff must demonstrate that: (1) the physician owed a duty to disclose the risk of one or more of the collateral injuries that the patient suffered; (2) the physician breached that duty; (3) the patient suffered injury; (4) the physician's breach of duty was a cause of the patient's injury in that (a) the physician's treatment was a substantial factor in bringing about the patient's injury and (b) a reasonable person in the plaintiff patient's position would not have consented to the treatment that led to the injuries had the

plaintiff patient been properly informed; and (5) no other cause is a superseding cause of the patient's injury. *Bernard v. Char*, 79 Hawai'i 362, 365, 371, 903 P.2d 667, 670, 676 (1995) [hereinafter, *Bernard II*]. In order to determine whether a physician owes a duty to disclose a particular piece of information to the patient, this court, relying upon the seminal case of *Canterbury v. Spence*, 464 F.2d 772, *reh'g denied*, 464 F.2d 772 (D.C.Cir.1972), *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972), has adopted the "patient oriented standard." *See Carr v. Strode*, 79 Hawai'i 475, 480, 485, 904 P.2d 489, 494, 499 (1995); *accord Bernard II*, 79 Hawai'i at 365, 903 P.2d at 670. The patient oriented standard requires a physician to disclose "what a reasonable patient needs to hear from his or her physician in order to make an informed and intelligent decision regarding treatment. . . ." *Carr*, 79 Hawai'i at 484, 904 P.2d at 498.

Under the patient standard, expert testimony is not critical to demonstrate the amount of information a patient needs in order to intelligently decide between two treatment options. The decision as to what procedure to undergo is ultimately the patient's; to impose a standard of disclosure dictated by experts would be to undermine the decision-making power of patients in similar situations. Therefore, in proving the element of duty for informed consent purposes, **a patient is not required to produce any expert medical testimony regarding what other reasonable [physicians] would have disclosed under the same or similar circumstances.**

7. In formally embracing the patient oriented standard governing the duty to disclose information in *Carr*, this court adopted the reasoning of the ICA in *Bernard I*. *See Carr*, 79 Hawai'i at 484, 904 P.2d at 498. In *Bernard II*, filed within one day of *Carr*, this court granted certiorari to the *Bernard I* court in order to both affirm the *Bernard I* court's application of the patient oriented standard and to clarify other aspects of the tort of negligent failure to obtain informed consent. *See Bernard II*, 79 Hawai'i at 363, 903 P.2d at 668.

8. The therapeutic privilege asserted by the defendant physicians in *Nishi* was one of two alternative grounds upon which this court affirmed the trial court. *See Nishi*, 52 Haw. at 195–96, 473

*Id.* (citing *Bernard I*, 79 Hawai'i at 382, 903 P.2d at 687) (underscored emphasis in original) (bold emphasis added).[7]

However, typically, expert testimony is necessary in informed consent cases. In particular, expert testimony will ordinarily be required to establish the "materiality" of the risks, *i.e.*, "the nature of risks inherent in a particular treatment, the probabilities of therapeutic success, the frequency of the occurrence of particular risks, and the nature of available alternatives to treatment." *Carr*, 79 Hawai'i at 486, 904 P.2d at 500 (citing *Bernard I*, 79 Hawai'i at 383, 903 P.2d at 688). Because lay jurors do not normally possess such information, it must be made available to them by an expert in order that they can determine the factual question whether a reasonable person would have wanted to consider the purportedly withheld information before consenting to the treatment. *See Carr*, 79 Hawai'i at 486, 904 P.2d at 500. The plaintiff, however, need not necessarily provide such expert testimony; the requisite foundation can be established by the defendant's expert testimony. *See id.* at 487, 904 P.2d at 501.

As discussed *infra*, expert testimony may, depending on the circumstances, also be required to refute the existence of the "therapeutic privilege exception" to the duty to disclose relevant information. This "exception" to the duty to completely inform a patient of all of the risks attendant to a particular treatment was first articulated in *Nishi v. Hartwell*, 52 Haw. 188, 473 P.2d 116, *reh'g denied*, 52 Haw. 296, 473 P.2d 116 (1970).[8] In *Nishi*, the plaintiff was paralyzed

P.2d at 120–21. The other basis for this court's decision in *Nishi* appeared to promote the more traditional "physician oriented standard" for evaluating a physician's duty to disclose information. *See id.* at 196–97, 473 P.2d at 121. In contrast to the patient oriented standard, the physician oriented standard required disclosure of information that a reasonable *physician* believed should be disclosed to a patient. *See Carr*, 79 Hawai'i at 484, 904 P.2d at 498. *Carr* expressly overruled *Nishi* to the extent that *Nishi* suggested that a physician oriented standard was applicable. *See Carr*, 79 Hawai'i at 485, 904 P.2d at 499. However, *Carr* did not affect the holding of *Nishi* with respect to a defendant physician's assertion of a therapeutic privilege.

from the waist down by the injection of a contrast dye used to obtain an x-ray of his thoracic aorta. *See id.* at 190, 473 P.2d at 118. One of the treating physicians testified that the plaintiff was never informed that paralysis was a potential side effect because, *inter alia,* it would have been a "terrible mistake" due to the fact that he was in pain, frightened and apprehensive about his condition, had serious heart disease and hypertension, and the physician felt that disclosure of a side effect with such a minimal risk would make matters worse. *See id.* at 193, 473 P.2d at 120. The plaintiff did not present any evidence to refute this contention, and the trial court directed a verdict at the close of the plaintiff's case. *See id.* at 195–96, 473 P.2d at 121. This court affirmed the trial court, holding that the uncontradicted evidence "brought defendants' omission to disclose clearly within the exception to the duty of full disclosure which excuses the withholding of information for therapeutic reasons." *Id.* at 195, 473 P.2d at 121.

In *Canterbury,* the United States Court of Appeals for the District of Colombia, citing *Nishi,* among others, described the therapeutic privilege exception as follows:

> The [therapeutic privilege] exception obtains when risk-disclosure poses such a threat of detriment to the patient as to become unfeasible or contraindicated from a medical point of view. It is recognized that patients occasionally become so ill or emotionally distraught on disclosure as to foreclose a rational decision, or complicate or hinder the treatment, or perhaps even pose psychological damage to the patient. Where that is so, the cases have generally held that the physician is armed with a privilege to keep the information from the patient, and we think it clear that portents of that type may justify the physician in action he deems medically warranted. The critical inquiry is whether the physician responded to a sound medical judgment that communication of the risk information would present a threat to the patient's well-being.

*Canterbury,* 464 F.2d at 789 (footnotes omitted). Similarly, the ICA has stated:

> Clearly it will not in every case be in the patient's own best interest to be told all the bad results that might possibly attend a course of treatment. Some patients are so likely to exaggerate their fears out of all proportion to reality that their power of free choice will be destroyed rather than informed; some are likely to be unreasonably deterred from treatment they desperately need.

*Bernard I,* 79 Hawai'i at 383, 903 P.2d at 688; *see also Leyson v. Steuermann,* 5 Haw.App. 504, 513–514, 705 P.2d 37, 45 (relying upon Prosser and Keeton, *The Law of Torts,* § 32 at 192 (5th ed.1984), to identify, *inter alia,* a "therapeutic privilege" exception to the duty to obtain informed consent),[9] *overruled on other grounds by Bernard II,* 79 Hawai'i at 371, 903 P.2d at 676.

▮▮▮▮ Our cases have suggested that expert testimony is ordinarily required to rebut a defendant physician's claim asserting the therapeutic privilege exception. *See Bernard I,* 79 Hawai'i at 383, 903 P.2d at 688 ("expert testimony as to the proper medical standards of disclosure will be required where a physician justifies his or her nondisclosure of risks to a patient on the basis of the therapeutic privilege exception"); *cf. Carr,* 79 Hawai'i at 485, 904 P.2d at 499 (noting that, "barring situations where the therapeutic privilege exception to the physician's duty to disclose is applicable," expert testimony is not needed to resolve the question of what an individual patient reasonably needs to hear in order to make an informed choice regarding the proposed medical treatment). Requiring expert testimony to rebut a claim of therapeutic privilege is nothing more than a specific application of the well-established rule that "[t]he standard of care to which a doctor has failed to adhere [in ordinary medical negligence actions] must be

9. Although the discussion of the therapeutic privilege exception in all of the Hawai'i cases cited since *Nishi*—and in *Canterbury,* as well—is dicta, the cases repeatedly discuss the exception in the context of explicating "limits" to the patient oriented standard, thereby suggesting that Hawai'i appellate courts have intended this exception to remain applicable. *See, e.g., Carr,* 79 Hawai'i at 485, 904 P.2d at 499; *Bernard I,* 79 Hawai'i at 383, 903 P.2d at 688; *Leyson,* 5 Haw.App. at 513–14, 705 P.2d at 45; *accord Canterbury,* 464 F.2d at 788–89.

established by expert testimony because a jury generally lacks the requisite special knowledge, technical training, and background to be able to determine the applicable standard without the assistance of an expert." *Craft*, 78 Hawai'i at 298, 893 P.2d at 149 (citing *Rosenberg v. Cahill*, 99 N.J. 318, 492 A.2d 371, 374 (1985)) (citations and internal quotation marks omitted).[10] Furthermore, as the ICA has stated:

> Although [exceptions to the duty to obtain informed consent] are not defenses and are a part of the definition of the duty [to obtain informed consent], the defendant-physician has the initial burden of going forward with evidence pertaining to them. If and when the physician meets that burden, however, the plaintiff-patient has the ultimate burden of proving their nonexistence.

*Leyson*, 5 Haw.App. at 516, 705 P.2d at 45 (citing *Canterbury*, 464 F.2d at 791). Thus, where the defendant physician justifies nondisclosure on the basis of the therapeutic privilege exception, expert testimony may be required to refute the contention.

■ In this case, the testimony generally placed the risk of developing NMS at one to eight per thousand for any given individual who takes antipsychotic medication.[11] Therefore, as an initial matter, we

believe that, under *Carr*, the trial court was correct in its initial determination that the question whether Dr. Betwee owed a duty to disclose the risk of developing NMS was one properly for the jury.[12] However, the trial court ruled that Dr. Betwee had established the therapeutic privilege exception to justify his nondisclosure of the risk of developing NMS to Barcai. Because there was no competing expert testimony upon which the jury could evaluate Dr. Betwee's claim of therapeutic privilege, the court refused to allow an informed consent instruction inasmuch as it believed that the uncontradicted expert testimony established that it would have been harmful to Barcai to hear the information.

■ Plaintiffs, however, contend that, at trial, Dr. Betwee never properly established the therapeutic privilege exception. Plaintiffs submit that Dr. Betwee's generic statement that he never tells any of his patients about the risk of developing NMS is insufficient to assert this privilege because the therapeutic privilege exception is a factual issue specific to a particular patient. Plaintiffs point out that none of the expert witnesses testified specifically that it would have been harmful to Barcai to receive this information. Plaintiffs also correctly point out that requiring expert testimony to rebut a generic assertion of therapeutic privilege

10. Although one would ordinarily expect the need for expert testimony to rebut a defendant physician's assertion of the therapeutic privilege exception, such is not universally the case. If the jury could evaluate the defendant physician's testimony without specialized expert knowledge, no such expert testimony is needed and the jury should be instructed on the informed consent issue. For example, a jury is capable of assessing the claims of a defendant physician who testifies, without more, that he or she did not inform an otherwise psychologically healthy patient of a particular risk because in the defendant's medical judgment it would unduly "worry" the patient. This situation is similar to the "common knowledge exception" to the requirement that a plaintiff seeking to prove medical negligence must present expert testimony in support of his or her claims. The common knowledge exception "provides that certain medical situations present routine or non-complex matters wherein a lay person is capable of supplanting the applicable standard of care from his or her 'common knowledge' or ordinary experience." *Craft*, 78 Hawai'i at 298, 893 P.2d at 149; *see also Canterbury*, 464 F.2d at 792 ("med-

ical facts are for medical experts and other facts are for any witnesses—expert or not—having sufficient knowledge and capacity to testify to them"). It is only when the particular facts associated with the physician's rationale for withholding disclosure involve "medical facts" that expert testimony will be required to rebut the claim and allow the jury to consider an informed consent claim.

11. The expert testimony also provided for the jury information that was needed to establish the "materiality" of the other necessary elements of an informed consent claim, such as Barcai's general condition, the benefits to be obtained from the antipsychotic medication and common risks associated therewith, and the alternatives to its use.

12. Contrary to the defense's assertion, we do not believe it appropriate or wise for this court to declare, as a matter of law, that the risk is so small that no reasonable juror could have concluded that a reasonable patient would have wanted to hear about it.

would allow the "exception" to swallow the general rule that expert testimony is not necessary for a jury to decide whether a reasonable person would have wanted to be informed of a particular risk. If, for example, all a physician had to do to assert the privilege was to claim that he or she never told patients of a particular risk because the risk would "scare them," it would eviscerate the patient oriented disclosure standard because expert testimony would always be required to rebut such a general claim. Moreover, in discussing the therapeutic privilege exception, the court in *Canterbury* noted:

> The physician's privilege to withhold information for therapeutic reasons must be carefully circumscribed, however, for otherwise it might devour the disclosure rule itself. The privilege does not accept the paternalistic notion that the physician may remain silent simply because divulgence might prompt the patient to forego therapy the physician feels the patient really needs. That attitude presumes instability or perversity for even the normal patient, and runs counter to the foundation principle that the patient should and ordinarily can make the choice for himself.

*Canterbury,* 464 F.2d at 789. Thus, in order to assure that the use of the therapeutic privilege exception is "carefully circumscribed," the trial court should ensure that the defendant physician who claims the privilege expressly testifies that his or her decision to withhold information was based on specific considerations in the individual patient's case and identify those considerations.

In this case, the defense maintains that the evidence established the therapeutic privilege because: (1) Dr. Betwee testified that acutely ill patients often are unable to adequately understand detailed information; and (2) Barcai's paranoia and fear of the nursing staff supports the conclusion that it would have been harmful to disclose information about NMS to Barcai. Indeed, Dr. Betwee, in relating his general disclosure practice, discussed as a hypothetical patient "someone who says he's God or who is fearful of the

nurses...." *See supra* at ——, 50 P.3d at 958. Although describing his practice generally, Dr. Betwee's testimony arguably could be interpreted as indicating that he believed Barcai, who exhibited behaviors similar to the hypothetical patient, was unable to adequately understand detailed information about NMS and that, therefore, disclosure of such information to him might be harmful. Certainly, Dr. Betwee's testimony is not inconsistent with this claim. However, as discussed above, given the need to "carefully circumscribe" the therapeutic privilege exception, we conclude that Dr. Betwee's testimony fell short of establishing the privilege in Barcai's case where Dr. Betwee did not expressly testify that his decision to withhold information was based on specific considerations in Barcai's case and did not identify those considerations.

 Moreover, although we recognize that the claim of privilege is not an affirmative defense and that the burden of rebutting such a claim remains with the Plaintiffs, we believe it would be unfair to penalize Plaintiffs for not having expert testimony available to rebut this claim when it is raised for the first time during trial. *See, e.g.,* Rules of the Circuit Courts of the State of Hawai'i (RCCH) Rule 12(b)(3) (2000) [13] and Rule 12(h) (2000) (requiring defendants to file a responsive pretrial statement that includes "all defenses advanced ... and the type of evidence expected to be offered in support" thereof); RCCH Rule 12.1(b)(2)(iv) (2000) (requiring defendants to set forth, in their settlement conference statement, their defenses to each theory of liability). Throughout Dr. Betwee's answers to interrogatories and in his deposition testimony, as well as in the defense's trial statement, settlement conference statements, and memorandum in opposition to Plaintiffs' proposed jury instructions, no mention is made of this claim. Accordingly, we hold that the trial court erred in finding that Dr. Betwee had established the therapeutic privilege excep-

---

13. The same requirements for each of the rules cited herein were in effect at the time of this trial.

tion and, as a result, also erred in refusing the informed consent instruction.[14]

## III. CONCLUSION

Based on the foregoing reasons, we affirm the trial court's final judgment, except as to the claim of negligent failure to obtain informed consent. Accordingly, we remand this case for a new trial on the informed consent claim and damages, if any, arising therefrom. On remand, Dr. Betwee is free to assert the therapeutic privilege exception if he so chooses.

Concurring Opinion of ACOBA, J., with whom RAMIL, J., joins.

I concur in the result reached but on different grounds. In my view, the following general propositions apply in a case of this nature. On appeal from any modification or reversal of a motion in limine ruling, the question before the appellate court is whether any *prejudice* was suffered by the party that relied on the original ruling, requiring a new trial. When ruling on a motion in limine, the trial court must ascertain whether any determination can appropriately be made before trial. If such can be rendered, the court should so rule. If a decision cannot be rendered, the trial court should so inform the parties on the record, defer determination on the issue until that point in the trial when a resolution can be made, and prohibit reference to the matter pending its ruling. If, after trial has begun, a ruling made pretrial is modified or reversed, the trial court must adopt such measures as will mitigate any resulting prejudice to the parties affected.

In light of these propositions, I disagree with the contention in the answering brief of Defendant–Appellee Jon Betwee (Defendant) that Plaintiffs–Appellants Lou Ann Barcai, et. al. (Plaintiffs) were not justified in relying on the court's order granting their motion in limine, but should have anticipated its reversal:

> · The key flaw in Plaintiffs Appellants' argument is that they *erroneously relied on the trial court's ruling* on the motion in limine[.] . . .
>
> Since the trial court's initial ruling on the motion in limine is always subject to change until the actual evidence was introduced at trial, . . . Plaintiffs[ ] made a poor tactical decision to not question jurors as to their feelings concerning a person who had a history of bizarre, violent, and sometimes criminal behavior, albeit, during periods of mental illness.

(Emphasis added.)

Defendant's approach places the responsibility on litigants to second-guess each in limine ruling a trial court makes. In such a setting, the court's order remains subject to question, the precise situation sought to be avoided by obtaining an in limine ruling. If the parties cannot rely on the court's ruling, chaos will result. Inasmuch as parties reasonably expect courts to abide by their decisions on such motions, we should not place the onus on a party to speculate as to whether a particular ruling on a motion in limine will later be reversed by the trial court. For the same reason, we should not engage in a post-trial analysis as to whether such a guess was appropriate or not, as Defendant would apparently invite us to do. Rather than asking whether Plaintiffs' reliance on the court's

---

**14.** The defense contends that, if the trial court erred in applying the therapeutic privilege exception, any such error was harmless because the jury found in Dr. Betwee's favor. The defense submits that the jury must have concluded that Barcai did not die of NMS and that, therefore, the failure to inform Barcai of the possibility of NMS could not have caused his death. We disagree. In our view, it is equally plausible that the jury could have concluded that Barcai died of NMS but that Dr. Betwee was not negligent in failing to diagnose it. If such were the case, the issue of informed consent would still be relevant.

The defense further contends that the judgment could be affirmed on the alternative grounds that there is no duty of disclosure where the disclosure is precluded by the patient's incapacity. See *Bernard I*, 79 Hawai'i at 379, 903 P.2d at 684. Although the evidence may suggest that Barcai was not able to provide "full" informed consent in the sense of what a reasonable nonpsychotic individual would have wanted to know about the risks of neuroleptic medication, we are unable to conclude on this record, as a matter of law, that Barcai was incompetent to make medication decisions. See generally *Steele v. Hamilton County Community Mental Health Bd.*, 90 Ohio St.3d 176, 736 N.E.2d 10, 20 (2000) (discussing the fact that mental illness and incompetence are not one and the same).

decision was ultimately right, the proper standard of review to be applied is whether the court's modification or reversal of its ruling resulted in prejudice to Plaintiffs, when Plaintiffs relied on the original in limine determination.

## I.

A motion in limine is " 'a procedural device which requests a pretrial order enjoining opposing counsel from using certain prejudicial evidence in front of a jury at a later trial.' " *State v. Miura*, 6 Haw.App. 501, 504, 730 P.2d 917, 920 (1986) (quoting H. Rothblatt & D. Leroy, *The Motion in Limine in Criminal Trials: A Technique for the Pretrial Exclusion of Prejudicial Evidence*, 60 Ky. L.J. 611, 613 (1972)) (other citations omitted). It is intended to afford the trial courts and the parties the opportunity to resolve, prior to trial, matters that would otherwise obstruct the smooth and orderly progress of the trial:

> The motion in limine affords an opportunity to the court to rule on the admissibility of evidence in advance, and prevents encumbering the record with immaterial or prejudicial matter, as well as providing means of ensuring that privileged material as to which discovery has been allowed by the court will not be used at trial if it is found to be inadmissible.

*Kuroda v. Kuroda*, 87 Hawai'i 419,. 427, 958 P.2d 541, 550 (App.1998) (quoting 75 Am. Jur.2d *Trial* § 94 (1991)) (brackets omitted) (emphasis added); *see also Proper v. Mowry*, 90 N.M. 710, 568 P.2d 236, 240 (N.M.Ct.App. 1977) ("Such a motion is also a useful tool in preventing immaterial matter from encumbering the record. It gives the court an opportunity to rule in advance on the admissibility of evidence." (Internal quotation marks, brackets, and citation omitted.)).

Thus, the motion in limine is intended to establish the parameters for the introduction of evidence at trial. *See State v. Gonsalves*, 5 Haw.App. 659, 668, 706 P.2d 1333, 1340 (1985) ("[T]he purpose of a motion in limine is to keep evidence away from the ... jury[.]"), *overruled on other grounds by State v. Kelekolio*, 74 Haw. 479, 849 P.2d 58 (1993). It also assists litigants in formulating their trial strategies. *See United States v. Yannott*, 42 F.3d 999, 1007 (6th Cir.1994) ("[A] motion in limine ... allows the parties to consider the court's ruling in formulating their trial strategy." (Citation omitted.)), *cert. denied*, 513 U.S. 1182, 115 S.Ct. 1172, 130 L.Ed.2d 1125 (1995). Further, as one commentator has explained, motions in limine rid the trial process of undue surprises:

> The motion in limine is a comparatively recent legal development. Traditionally, Anglo Saxon law encouraged the presentation of evidence in an orderly and consecutive manner at a single hearing or trial. Pretrial techniques and bifurcated proceedings were discouraged as both wasteful and unnecessary. However, *the federal courts and many state courts eventually found it desirable to develop discovery and other pretrial devices to allow for efficient disposition of complicated lawsuits and to remove the element of surprise from the courtroom.*

20 Am.Jur. *Trials* § 441 (1973) (emphasis added).

## II.

As a general matter, parties should be able to rely on a court's in limine rulings. In both civil and criminal cases, courts are vested with authority to dispose of trial-related disputes prior to trial. *See Meyer v. City and County of Honolulu*, 6 Haw.App. 505, 510 n. 8, 729 P.2d 388, 393 n. 8 ("[T]he granting or. denying of a motion in limine is within the trial court's inherent power to exclude or admit evidence." (Internal quotation marks, brackets, and citation omitted.)), *aff'd in part, rev'd in part by* 69 Haw. 8, 731 P.2d 149 (1986); *State v. Kealoha*, 95 Hawai'i 365, 379, 22 P.3d 1012, 1026 (App.2000) ("[T]he granting or denying of a motion in limine is within the trial court's inherent power to exclude or admit evidence." (Internal quotation marks and citations omitted.)), *cert. dismissed*, 95 Hawai'i 365, 22 P.3d 1012 (2001). The rules of civil and penal procedure encourage the use of motions in limine.

For example, Hawai'i Rules of Civil Procedure (HRCP) Rule 16(c)(3), governing pretrial conferences, advises that courts may

conduct such conferences to consider the possibility of obtaining "advance rulings from the court on the admissibility of evidence[.]" Similarly, in the criminal arena, Hawai'i Rules of Penal Procedure (HRPP) Rule 12(b), regarding pretrial motions, explains that "[a]ny defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion." In that regard, "[p]retrial motions and requests must be made within 21 days after arraignment unless the court otherwise directs." HRPP Rule 12(c). Thus, motions in limine are part of a pretrial process intended to resolve issues in advance of trial.

It follows, then, that a ruling on a motion in limine does not require further objection during trial to preserve an issue for appellate review because the matter had been previously raised, argued, and ruled on:

> [O]bjections need not be renewed if the prior ruling on the motion in limine amounted to an unequivocal holding concerning the issue raised. *Where a hearing was held, counsel presented legal arguments, and the trial court ruled whether or not the challenged evidence would be admitted at trial, there is no necessity of further objection to preserve such error for appeal.*

*Lussier v. Mau–Van Dev.,* 4 Haw.App. 359, 393–94, 667 P.2d 804, 826 (emphasis added) (citations omitted), *reconsideration denied,* 4 Haw.App. 359, 667 P.2d 804 (1983). In this framework, it is reasonable that parties rely on the rulings made.

Significant to this case is the fact that a ruling that precludes the mention of particular evidence is presumed to be binding for purposes of trial:

> When the trial judge denies a motion to exclude evidence, made in limine, unless he [or she] clearly indicates to the contrary, it is the legal equivalent to an announcement that he [or she] reserves the right to rule on the subject evidence at the time of its offer, and is not a final ruling made in a pre-trial context.
>
> For obvious reasons, *the same result does not obtain where the motion in limine is granted. In this instance, the*

*nonmoving party, by virtue of the adverse ruling, is precluded from taking some proposed or anticipated action. To further pursue the very course of action [the nonmoving party] is now restrained from pursuing is itself violative of the court's ruling[.]*

*Baxter v. Surgical Clinic of Anniston, P.A.,* 495 So.2d 652, 654 (Ala.1986) (emphasis added). Hence, where a party is precluded from mentioning a subject, as was the case here, the parties may reasonably expect to rely on that ruling.

### III.

In advancing the proposition in his answering brief that Plaintiffs should not have relied on the court's in limine ruling, but should have anticipated its reversal, Defendant relies on *Craft v. Peebles,* 78 Hawai'i 287, 296, 893 P.2d 138, 147 (1995). *Craft* is not on point. The trial court there did not enforce its motion in limine ruling because Craft opened the door to testimony which was excluded under the ruling. *See id.* at 296, 893 P.2d at 147 ("The record indicates that, irrespective of the trial court's in limine ruling, evidence admitted during the plaintiff's case[-]in[-]chief 'opened the door' to the cross-examination regarding her alleged substance abuse."). The case thus stands for the proposition that an in limine ruling need not be enforced in the event the party requesting the limiting order has introduced evidence in violation of the ruling. Plainly that is not the case here. In the instant case, the court reversed its own ruling. Plaintiffs did not invite it.

We recently affirmed the proposition that parties may rely on in limine rulings in *Nelson v. University of Hawai'i,* 97 Hawai'i 376, 38 P.3d 95 (2001). There, the plaintiff, a former assistant professor at the University of Hawai'i (UH), sued UH, claiming, among other things, sexual harassment and discrimination. The defendants filed a motion in limine to prohibit the plaintiff from mentioning that her contract was not renewed due to retaliation or discrimination. *See id.* at 381, 38 P.3d at 100. The motion was granted, but during the defendants' case-in-chief, the court admitted into evidence a letter written

by a dean to the plaintiff, informing her that her contract would not be renewed. *See id.* at 383, 38 P.3d at 102.

The plaintiff "objected to the admission of [the] memorandum to [the dean] ·from the personnel committee regarding its recommendations for nonrenewal, apparently based on the trial court's prior ruling on the motion in limine[.]" *Id.* Nevertheless, the memorandum was admitted. The plaintiff sought to offer rebuttal evidence "to challenge [the d]efendants' explanation for the nonrenewal of her contract[.]" *Id.*

The trial court precluded the plaintiff from offering such evidence. *See id.* We held that the court abused its discretion in doing so, in part because the plaintiff *properly relied on the court's in limine ruling:*

> Because the trial court's ruling on the motion in limine ostensibly precluded evidence of the 1996 renewal process, we cannot conclude that [the plaintiff] "held back" confirmatory evidence of her case. Moreover, *it is unreasonable to suggest that [the plaintiff] should have anticipated that [the d]efendants would present specific evidence of the 1996 contract renewal process—especially in light of their own motion in limine*—or that they would be allowed, over objection, to introduce the 1996 personnel committee's evaluation of [the plaintiff].

*Id.* at 385, 38 P.3d at 104 (emphases added). *Nelson* confirms the proposition that once a trial court makes an in limine ruling, a party is justified in relying on such a ruling.

## IV.

### A.

A trial court's rulings on motions in limine may be "unequivocal," rendering it illogical for litigants to have to consider whether or not their reliance on such rulings would be considered reasonable upon appellate review, in the event the ruling is reversed by the trial court. However, Defendant advances the suggestion that pretrial rulings on motions in limine "are always subject to change until the actual evidence [is] introduced at trial." But the question of what is to be reasonably anticipated at trial is at the cen-

ter of every in limine issue, and assumably is incorporated in the in limine ruling by the court. Motions in limine are brought precisely because the parties anticipate what the evidence will be, and, thus, by virtue of the procedure followed, what is anticipated is *already* inherent in the court's ruling.

### B.

If a trial court cannot appropriately rule until that point in the trial when the disputed evidence may be viewed in context, then I believe the better practice is that the trial court should refrain from rendering a pre-trial ruling and defer such ruling for trial. *See United States v. Cline,* 188 F.Supp.2d 1287, 1291 (D.Kan.2002) (stating that although pre-trial "rulings can work a savings in time, cost, effort and preparation, a court is almost always better situated during the actual trial to assess the value and utility of evidence[,]" and, thus, "[t]he better practice is to wait until trial to rule on objections when admissibility substantially depends upon what facts may be developed there") (citing *Sperberg v. Goodyear Tire & Rubber Co.,* 519 F.2d 708, 712 (6th Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 303 (1975); *Hunter v. Blair,* 120 F.R.D. 667 (S.D.Ohio 1987)); *State v. Dopp,* 129 Idaho 597, 930 P.2d 1039, 1045–46 (Idaho Ct.App. 1996) (declaring that, "[b]ecause a motion in limine is based on an alleged or anticipated factual scenario, ... the trial judge will not always be able to make an informed decision regarding the admissibility of the evidence prior to the time the evidence is actually presented at trial[,]" and, thus, "[t]he trial judge, in the exercise of ... discretion, may decide that it is inappropriate to rule in advance on the admissibility of evidence ..., but may defer his [or her] ruling until the case unfolds and there is a better record upon which to make his [or her] decision" (citations omitted)).

To do otherwise would invite unnecessary disruption of the trial and, as in this case, an appeal. *See Dawson v. State,* 581 A.2d 1078, 1087 (Del.1990) (indicating that delayed rulings are "designed to prevent unnecessary and unwarranted advisory opinions[, because, i]f no advance ruling is made, the parties

may decide to abandon their positions for reasons unrelated to the anticipated ruling of the court[ and, thus, a] refusal to rule may thus promote judicial economy" (citation omitted)), *vacated on other grounds by* 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992). If the trial court must defer ruling on the motion in limine, its decision should be expressly communicated to the parties and placed on the record. *See, e.g.,* HRPP Rule 12(e) ("A motion made before trial shall be determined before trial unless the court orders that it be deferred for determination at the trial of the general issue[.]")

## V.

### A.

Rulings on motions in limine can be amended, but only where there is a justifiable reason to do so. *See United States v. Bensimon,* 172 F.3d 1121, 1127 (9th Cir.1999) ("[P]arties *expect* a district court to adhere to its earlier ruling if no facts or circumstances arise to warrant a reversal[.]" (Emphasis added.)); *Yannott,* 42 F.3d at 1007 ("[W]e hold that the district court may change its ruling on a motion in limine where sufficient facts have developed to warrant the change."); *but see Luce v. United States,* 469 U.S. 38, 41–42, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984) ("Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of *sound judicial discretion,* to alter a previous *in limine* ruling." (Emphasis added.)) [1]

### B.

Once the decision is made to modify or reverse an in limine ruling, the trial court must take such measures necessary and appropriate to prevent prejudice which might result from such action. *See Marshall v. Osborn,* 213 Ill.App.3d 134, 156 Ill.Dec. 708, 571

N.E.2d 492, 496 (1991) (finding no abuse of discretion where the trial court reversed its original in limine ruling in part because "the trial court made a conscientious effort to minimize any surprise *or potential prejudice* by offering to rule before plaintiffs presented their case and by giving them the opportunity to reopen their case after the ruling [reversing the original determination]" (emphasis added)); *cf. Swietlowich v. Bucks County,* 610 F.2d 1157, 1164 (3d Cir.1979) (explaining that a trial judge who "decides to change . . . an earlier ruling . . . must also take appropriate steps so that the parties *are not prejudiced* by reliance on the prior ruling" and finding that "the *plaintiff suffered no prejudice* at trial . . . since she was fully prepared to meet the limitations defense" (emphases added)); *State v. Dowsett,* 10 Haw.App. 491, 495, 878 P.2d 739, 742 (1994) ("We hold, therefore, that before the court orders dismissal of a case because of the State's violation of HRPP Rule 16, it must consider whether less severe measures would rectify prejudice caused to the defendant by the violation."), *overruled on other grounds by State v. Rogan,* 91 Hawai'i 405, 423, n. 10, 984 P.2d 1231, 1249 n. 10 (1999).

The trial court may allow for additional voir dire of the already-selected jury, *cf. State v. Morishige,* 65 Haw. 354, 362, 652 P.2d 1119, 1126 (1982) (explaining that trial court conducted individual voir dire of juror during trial, where juror supposedly saw a guard take leg restraints off criminal defendant, and concluding that, based on voir dire results, mistrial was not warranted), or it may order a continuance, *cf. Gannett Pac. Corp. v. Richardson,* 59 Haw. 224, 234, 580 P.2d 49, 57 (1978) (determining that, where there is a concern that pretrial publicity may taint a jury pool, a continuance "until community passions subside" is a legitimate option).

---

1. *Luce* is not binding upon state courts because it does not address a constitutional issue. *See State v. Wickham,* 796 P.2d 1354, 1357 (Alaska 1990) ("Since the *Luce* rule was adopted pursuant to the Supreme Court's advisory power, it is not binding on the states." (Citation omitted.)); *Commonwealth v. Richardson,* 347 Pa.Super. 564, 500 A.2d 1200, 1203 (1985) ("The decision in *Luce* is not binding on the courts of this

Commonwealth because it is a decision based solely on a Federal Rule of Evidence."); *People v. Contreras,* 108 A.D.2d 627, 485 N.Y.S.2d 261, 263 (N.Y.App.Div.1985) ("*Luce* . . . is inapposite, since it interprets Federal law."). Of course, whether the court's exercise of its discretion was "sound" is dependent upon the circumstances of the particular case and is always subject to review.

It may limit or expand the scope of testimony, *see Nelson*, 97 Hawai'i at 385, 38 P.3d at 104 (explaining that trial court should have allowed plaintiff to offer rebuttal evidence in response to defendant's evidence which essentially violated its own motion in limine); *Kealoha*, 95 Hawai'i at 380, 22 P.3d at 1027 (ruling that court did not abuse its discretion when it admitted information regarding criminal defendant's sale of methamphetamine "only ... [for] determining Defendant's motive, opportunity, or intent to possess the dangerous drug" (internal quotation marks omitted)), or exclude or allow certain evidence, *see Craft*, 78 Hawai'i at 296, 893 P.2d at 147 ("The record indicates that, irrespective of the trial court's in limine ruling, evidence admitted during the plaintiff's case[-]in[-]chief 'opened the door' to the cross-examination regarding her alleged substance abuse.").

It may issue an appropriate cautionary instruction. *Cf. Kealoha*, 95 Hawai'i at 380, 22 P.3d at 1027 (determining that court did not abuse its discretion when it allowed evidence of a criminal defendant's sale of methamphetamine at trial, which was coupled with a cautionary instruction to the jury); *Gannett Pac. Corp.*, 59 Haw. at 234, 580 P.2d at 57 (explaining that courts may use "clear and express admonitions to the jury once selected" regarding possible trial publicity).

The foregoing are merely examples of the saving measures a trial court may take in the event it is necessary to modify or reverse a prior in limine ruling. The nature of the remedy employed in a particular case rests, of course, on the specific circumstances involved.

## VI.

Based on the considerations above, our task on appeal must be to ascertain whether the court's reversal of its own in limine ruling *prejudiced* a party in any way, not whether the party should have anticipated a change in the court's ruling. *See Bensimon*, 172 F.3d at 1125 (determining that, when a court considers the Rule 609(b) balancing test,[2] "the district court must consider any prejudice that will accrue to the defendant as a result of the court's reversal of an earlier in limine ruling" and consider whether "the prejudice a defendant might suffer as a result of a reversed ruling is consistent with ... Rule 609(b)" (citations omitted)); *United States v. Cardascia*, 951 F.2d 474, 489 (2d Cir.1991) ("We accept that evidentiary errors and reversed rulings may prejudice a defendant in such a way that he [or she] is denied a fair trial and his [or her] conviction must then be reversed." (Citations omitted.)).

## VII.

The question then is whether the court's reversal prejudiced Plaintiffs in the instant case. Prior to trial, Plaintiffs filed a motion in limine to exclude evidence of the decedent's prior bad acts, arguing that "[w]hether [the decedent] was arrested or incarcerated or committed acts that were less than exemplary ... was irrelevant to whether Defendant ... was negligent in his treatment."

Defendant's counsel first represented that Defendant did not consider the decedent's prior bad acts when rendering medical treatment. However, Defendant argued such information was relevant to Plaintiffs' claims of false imprisonment and battery:

> [PLAINTIFF'S COUNSEL]: I think there must be some kind of connection between the prior acts and treatment decisions....
>
> . . . .
>
> [DEFENSE COUNSEL]: *He is not going to say that he based his treatment on any prior acts.* As for the drugs that he gave him and so forth, that was based upon his admission at this time. He is going to say he was aware of his background and his predilection to violence, and that if *they are still going to pursue the false imprisonment claims, battery,* that this was pertinent on how to treat

---

**2.** Federal Rule of Evidence 609(b) prohibits the use of a conviction which is more than ten years old as impeachment "unless the court determines, in the interests of justice, that the proba-tive value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect."

him, and when the nurses called and said he was acting like a wild man—

(Emphases added.) Based on this representation, Plaintiffs' counsel agreed to dismiss the false imprisonment and battery claims:

THE COURT: ... What's your basis of your false imprisonment and assault and battery?

[PLAINTIFFS' COUNSEL]: I was just going to say that I agree to dismiss those claims—

THE COURT: Then, according to what [defense counsel] is saying that's [sic] becomes irrelevant.

[PLAINTIFFS' COUNSEL]: That is right, so I'll do that.

THE COURT: *So the claims for false imprisonment and assault and battery are dismissed with prejudice?*

[PLAINTIFFS' COUNSEL]: *That's correct. I am agreeing to that.*

(Emphases added.) The court granted the motion in limine with the qualification that it would reconsider its ruling if the decedent's family chose to testify about his prior bad acts:

[DEFENSE COUNSEL]: Well, so the family members are not going to be talking about prior psychiatric episodes?

THE COURT: I don't know why they would.

[PLAINTIFFS' COUNSEL]: Well, if they do talk about it, the door will be opened.

THE COURT: That's the way I look at it. *If it is made relevant by something the Plaintiff does, I'll reexamine it.*[3]

[DEFENSE COUNSEL]: *Very well.*

THE COURT: So I am going to grant the motion on those prior hospitalizations, bad acts, whatever you want to call them.

(Emphases added.) Following the determination of this and other motions in limine, the court commenced voir dire and the jury was sworn.

After the motions in limine and voir dire were completed, Plaintiffs' counsel disclosed that their expert would criticize Defendant's diagnosis. Subsequently, however, Plaintiffs withdrew this testimony so as to avoid any discussion of prior bad acts.

The following day, after learning that Plaintiffs' expert witness would criticize Defendant's diagnosis, but before hearing of Plaintiffs' subsequent decision otherwise, defense counsel reversed his prior representation and advised the court that the Defendant *had, in fact, considered the decedent's psychiatric history, including "prior bad acts":*

[DEFENSE COUNSEL]: Your Honor, in order for the doctor to make a correct diagnosis and decide on treatment, he has to know the patient's psychiatric history. That is essential. I think it shows he was a good doctor. We want to get into it because that's what a good psychiatrist does. He reviews the prior records.

. . . .

He has to treat—he has to know what this man did in the past. How bizarre was his behavior[.] . . .

. . . .

THE COURT: All right. [Defense counsel], I just want to get clear. *It is your position that [Defendant] is going to testify he read these records and all the prior bad acts, and that was taken into consideration before he treated or during the process of treatment that's at issue here?*

[DEFENSE COUNSEL]: *Yes, your Honor.*

(Emphases added.) The court then reversed its original in limine ruling and allowed evidence of the decedent's past bad conduct to be admitted, evoking surprise from Plaintiffs' counsel:

THE COURT: *I am going to rule that he can go into that. . . .*

[PLAINTIFFS' COUNSEL]: Let me just respond in a couple ways. I hear the

---

**3.** Courts can initially rule on a motion in limine and reverse themselves where, for example, the party seeking to exclude evidence "opens the door" to the evidence initially excluded. *See, e.g., Craft,* 78 Hawai'i at 296, 893 P.2d at 147 (explaining that court properly reversed its in limine ruling because "evidence admitted during the plaintiff's case[-]in[-]chief 'opened the door' to the cross-examination regarding her alleged substance abuse"); *see also supra* Part V.

court's ruling. *I am really surprised [defense counsel] has changed the position because he didn't say that yesterday. He said treatment [was] based upon what he showed in the hospital.*

(Emphases added.) Plaintiffs' counsel then claimed that his clients had suffered prejudice from the court's new ruling because the jury had already been selected and voir dire questions had been asked with the understanding that prior bad acts were inadmissible. Contending that the court's ruling had placed Plaintiffs in a "horrible" position, counsel argued that his voir dire would have been different, especially with respect to a juror who was a former police official:

> [PLAINTIFFS' COUNSEL]: I understand. The other thing though, Your Honor, *more of compelling concern to me is that we did discuss this before voir dire and you did make a ruling on prior bad acts, and on [sic] voir dire the jury based upon your ruling, and if I had known that [defense counsel] would be bringing in all these prior bad acts, I would have gone over that with the jury, and especially because we have a former deputy police chief there, I would have gone over that because it puts my clients' position in a very horrible place.* I just don't know how they are going to respond to this.
>
> [DEFENSE COUNSEL]: Your [H]onor, just one point. Before this trial started counsel agreed that the medical record for this admission could go into evidence. That was agreed upon.
>
> THE COURT: That has got all this stuff in it?
>
> [DEFENSE COUNSEL]: Yes, sir.
>
> THE COURT: Anyway, I don't want to hear anymore. You have already made a record.

(Emphasis added.) At the time the court altered its ruling, Plaintiffs had done nothing to "open the door" to the decedent's prior bad acts. Moreover, the court's change in ruling was premised on circumstances other than those it had indicated would warrant such a change. The court did nothing to mitigate any prejudice Plaintiffs may have suffered by their reliance on the court's original decision.

## VIII.

As stated *supra,* Plaintiffs maintained at trial that, had the court ruled as it ultimately did *prior* to voir dire, they would have questioned the jury venire regarding its view of the decedent's prior bad acts. I believe that the effective preclusion of a party's right to exercise his or her challenges for cause or peremptory challenges, in the absence of effective measures to cure such defect, is ordinarily reversible error. *See State v. Carvalho,* 79 Hawai'i 165, 174, 880 P.2d 217, 226 (App.1994) ("[T]he denial or impairment of a defendant's right of peremptory challenge in a criminal case is reversible error not requiring a showing of prejudice."), *cert. granted,* 77 Hawai'i 373, 884 P.2d 1149 (1994), *cert. dismissed,* 78 Hawai'i 474, 896 P.2d 930 (1995); *Leslie v. Allen–Bradley Co.,* 203 Mich.App. 490, 513 N.W.2d 179, 181 (1994) (in case where trial judge limited plaintiff's number of peremptory challenges, in violation of statute, reversing because "a party need not demonstrate prejudice arising from a claim of defective jury selection, since the requirement would impose an impossible burden" (citation omitted)); *cf. Babcock v. Northwest Mem'l Hosp.,* 767 S.W.2d 705, 709 (Tex.1989) (in medical malpractice case where trial court initially excluded any discussion of tort reform, and where juror during voir dire volunteered in front of venire his familiarity with advertisements regarding the need for tort reform, holding that trial court abused its discretion by prohibiting questions regarding such reforms because the result was that the plaintiffs "were denied the opportunity to intelligently exercise challenges"); *Fluharty v. Wimbush,* 172 W.Va. 134, 304 S.E.2d 39, 41–42 (1983) ("It is ... reversible error for a trial judge ... to ... limit the questioning of potential jurors as to infringe upon litigant's ability to determine whether the jurors are free from interest, bias[,] or prejudice, or to effectively hinder the exercise of peremptory challenges." (Internal quotation marks and citation omitted.)). Without doubt, the lack of an informed exercise of voir dire undermines the opportunity to obtain an impartial jury:

To obtain an impartial jury an examination into the qualifications, attitudes and inclinations of jurors before they are impaneled and sworn to try a case is necessary. Only by such examination can the information be obtained to constitute a basis for the exercise of a challenge to exclude from the jury those who might act from prejudice or interest or without qualification to judge soundly[.]

*Carr v. Kinney*, 41 Haw. 166, 166 (1955) (citation omitted).

However, as Defendant pointed out, Plaintiffs had apparently agreed to the admission of medical records that contained evidence of prior bad acts. Accordingly, evidence of the prior bad acts would have been received in evidence by the admission of such records. Arguably, the court's initial ruling on the motion in limine could have rendered the stipulation defunct, insofar as an objection could have been made to the introduction of the bad acts at the time the medical records were introduced. However, Plaintiffs do not make such an argument on appeal, but merely contend that their "right to informed exercise of peremptory challenges and to challenge jurors for cause were substantially impaired by the [court]." Without more, I cannot conclude that the change in the in-limine ruling resulted in prejudice to Plaintiffs. Therefore, I am compelled to agree that Plaintiffs were not prejudiced by the reversal of the in limine ruling.